**PARK VIEW HEIGHTS CORPORATION
et al., Appellants,**

**v.**

**The CITY OF BLACK JACK et al.,
Appellees.**

**No. 72–1006.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1972.

Decided Sept. 25, 1972.

Rehearing and Rehearing En Banc
Denied Oct. 26, 1972.

Lawrence G. Sager, American Civil Liberties Union Foundation, New York City, for appellants.

Roy W. Bergmann, and Sheldon K. Stock, Clayton, Mo., for appellees.

Before MURRAH* and VAN OOS-TERHOUT, Senior Circuit Judges, and HEANEY, Circuit Judge.

HEANEY, Circuit Judge.

This appeal questions the propriety of a District Court order, 335 F.Supp. 899,

* Senior Circuit Judge, Tenth Circuit, sitting by designation.

dismissing the plaintiffs' complaint for lack of standing and absence of a justiciable controversy.

The underlying question is the validity of a zoning ordinance which effectively prohibits the construction of multiracial, federally subsidized, moderate and low income housing in the City of Black Jack, Missouri.[1] The immediate questions are whether the sponsor and the developer of the housing development have standing to litigate the underlying question, and whether there is an actual controversy ripe for adjudication.

The plaintiffs are two nonprofit corporations, Inter-Religious Center for Urban Affairs, Inc., and Park View Heights Corporation, and eight individual plaintiffs suing as a class.[2] The defendants are the City of Black Jack, Missouri, its Mayor, the Chairman of its Zoning Commission, the members of its City Council and the members of its Zoning Commission.

For the purposes of this appeal, we accept the following pleaded facts as true:

In December 1969, St. Mark's United Methodist Church and United Methodist Metro Ministry decided to sponsor a housing development (known as Park View Heights) under § 236 of the National Housing Act, 12 U.S.C. § 1715z–1 (1968). St. Mark's, located in north St. Louis County and near the site of the proposed Park View Heights apartments, has a congregation of 1,200 members. Metro Ministry is the operational arm of the Missouri East Annual Conference of the United Methodist Church.

St. Mark's and Metro Ministry decided to develop apartments available for persons of all races and within the economic reach of moderate and low income persons with a location in St. Louis County to provide a better economic, educational and recreational environment for the tenants.

On December 24, 1969, ICUA, a Missouri nonprofit corporation, organized for the purpose of the effective use of the religious community's resources in alleviating St. Louis urban problems, signed a sales contract to buy 11.9 acres of land in an unincorporated area of St. Louis County (now located within the city limits of Black Jack) for $238,000, or $20,000 an acre. ICUA had been active with St. Mark's and Metro Ministry in the planning of the Park View Heights apartments and had advanced those organizations "seed money" financing. There is no indication in the record that this loan has been repaid.

On March 16, 1970, St. Mark's and Metro Ministry submitted an initial application to build the apartments to the federal government. Shortly thereafter, area residents began active opposition to the proposed location of the apartments. Led by the Black Jack Improvement Association and the Spanish Lake Improvement Association, residents held mass meetings, began a letter-writing campaign to federal administrative and elected officials, published circulars, and dispatched a delegation to present the Undersecretary of Housing and Urban Development with petitions and arguments against the apartments' location in the neighborhood.

1. We have previously decided that this appeal from a motion to dismiss is allowable as a "final action." 28 U.S.C. § 1291. The United States has been permitted to intervene in support of the plaintiffs. The United States has filed a suit against the City of Black Jack, alleging essentially the same conduct as is in issue here. United States v. City of Black Jack, C.A. No. 71–C–372(1) (E. D.Mo.).

2. The eight individual plaintiffs are residents of the City of St. Louis. Four live in urban ghetto housing; four live in federally subsidized, *moderate income housing*. Each plaintiff desires to live in St. Louis County due to its better economic, educational and recreational environment. Each has been unable to find housing in St. Louis County within an affordable price range, but would be able to afford the Park View apartments, which would be subsidized by the federal government. Each would qualify to live in the Park View apartments. Two of the plaintiffs are white, and the remainder are black.

On June 5, 1970, the Department of Housing and Urban Development issued a "feasibility letter," which reserved federal funds for the apartments. The letter is "tantamount to a contractual obligation to assist a project." Architectural plans have been completed and approved. A mortgage has been secured, and legal and organizational planning has been completed.

Upon learning of the "feasibility letter," area residents began a drive to incorporate the area including the site of the proposed Park View Heights apartments. On June 26, 1970, the Citizens for the Incorporation of Black Jack presented two petitions requesting incorporation with 1,425 signatures to the St. Louis County Council. Between June 26, 1970, and August 6, 1970, the St. Louis County Department of Planning reported to the St. Louis County Council that they "strongly opposed the act of incorporation on fiscal, planning, and legal grounds." Despite this opposition, the St. Louis County Council incorporated the City of Black Jack, Missouri, on August 6, 1970.

On August 13, 1970, Park View Heights Corporation was formed by St. Mark's, Metro Ministry, and Bishop Eugene M. Frank, the Office of the Missouri Bishop of the United Methodist Church, since July 1970, a joint sponsor of the Park View apartments. On September 8, 1970, Park View Heights Corporation assumed title to the proposed site as an assignee of ICUA.

Between the date of the municipal incorporation and September 15, 1970, the municipal authority of the City of Black Jack was suspended by a Writ of Prohibition issued by a state court. Within six days after the writ was dissolved, the city Zoning Commission issued notices of hearings on a zoning ordinance which would effectively prevent the construction of new multi-family dwelling units within the City of Black Jack. On October 20, 1970, the City Council passed the proposed zoning ordinance.

The present action was instituted in January, 1971.

The defendants moved to dismiss as to all parties, claiming that the plaintiffs did not have standing to bring the action, and that the controversy was not a justiciable one.

The court stated:

" *   *   * [T]he plaintiffs' claims fall into two categories: First, that the zoning ordinance of the City of Black Jack arbitrarily and irrationally excludes provisions for the erection of multi-family dwellings within the city, resulting in a drastic devaluation of the proposed site of the Park View Heights development in violation of the Fifth and Fourteenth Amendments; and second, that the purpose and effect of the zoning ordinance is to prohibit moderate and lower income persons, including members of the Negro race who do not even reside in St. Louis County, from moving into Black Jack in violation of their right to travel, the equal protection clause of the Fourteenth Amendment, the supremacy clause, the Thirteenth Amendment, the Civil Rights Act of 1866 (42 USC §§ 1981 and 1982), the Civil Rights Act of 1964 (42 USC § 2000d), the Fair Housing Act of 1968 (42 USC § 3601, et seq.), and the National Housing Act (42 USC § 1401, et seq.)."

The court went on to hold that:

(1) Park View held exclusive title to the land, thus it alone had standing to question whether the zoning ordinance was arbitrary and irrational and resulted in a taking of property without due process. Neither ICUA nor the individual plaintiffs had standing to raise this issue—ICUA because it had assigned its option to Park View and the individual plaintiffs because they were not personally harmed by the rezoning of the property.

(2) Neither Park View nor ICUA had standing to question whether the purpose and effect of the ordinance was to exclude low and moderate income persons, including Negroes, from the City of Black Jack because neither was a person allegedly excluded from living in

**1212**

Black Jack, neither alleged a violation of its constitutional rights, and neither's membership qualified it as a proper representative of lower or moderate income persons.

(3) No case or controversy exists as between the individual plaintiffs and the defendants as no building permit has been denied and no request for a zoning change or a variance has been made.

On the basis of the above reasoning, the court granted the defendants' motion to dismiss as to ICUA and the individual plaintiffs. It also granted the motion to dismiss as to Park View except insofar as Park View alleged that its property had been taken without due process.

■■ (1) We believe that the trial court erred in holding that ICUA was without standing to press the due process claim. The complaint alleged that ICUA advanced substantial "seed money" financing, and nothing in the pleadings indicates that this advance has been repaid by Park View in whole or in part.[3] Furthermore, ICUA has expended time and energy in planning and de-

veloping the project, and there is no indication in the pleadings that it has been reimbursed for its services. Either the continued existence of the loan from ICUA *or* the already expended developmental time and effort constitutes " 'a personal stake in the outcome of the controversy' "[4] sufficient to grant ICUA standing to litigate the due process claim.

■■ (2) We believe that both ICUA and Park View have standing to question whether the purpose and effect of the ordinance is to exclude low and moderate income individuals from the City of Black Jack in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution.

First, they have this right by virtue of their own economic interest in the project. It is as important to protect the right of sponsors and developers to be free from unconstitutional interferences in planning, developing, and building an integrated housing project, as it is to protect the rights of potential tenants of such projects.

3. It is appropriate here to briefly review the standards to be applied in ruling on a motion to dismiss.

"The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). " * * * [P]leadings are to be construed liberally in favor of the pleader." Great Atlantic & Pacific Tea Co., Inc. v. Amalgamated Meat Cutters & Butcher Workmen of America, Local Union No. 88, AFL–CIO, 410 F.2d 650, 652 (8th Cir. 1969).

In ruling on the motion to dismiss, all well-pleaded allegations of the complaint must be accepted as true, Montgomery Ward & Co. v. Langer, 168 F.2d 182, 185 (8th Cir. 1948), as well as all inferences which may reasonably be drawn from the facts alleged. Ketcher v. Sheet Metal Workers' International Assn., 115 F.Supp. 802, 814 (E.D.Ark. 1953). The legitimate intendments of the pleader in narrating alleged facts

must be resolved in favor of the pleading being attacked. Pheiffer v. Pennsylvania R. Co., 186 F.2d 558 (6th Cir. 1951) ; Massachusetts Bonding & Ins. Co. v. Darby, 59 F.Supp. 175, 177 (W.D.Mo. 1945).

4. Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972) ; Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). At this beginning point of our "standing" discussion, we record our preference for simplifying the "law on standing." We think that all that is required for a plaintiff to have standing to sue for a constitutional or a statutory violation is a showing of "injury in fact." See, Davis, The Liberalized Law of Standing, 37 U.Chi.L.Rev. 450 (1970) ; Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970) ; Air Reduction Co. v. Hickel, 137 U.S. App.D.C. 24, 420 F.2d 592 (1970) ; Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966) ; Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964). We will, however, apply the rationale on "standing" as recently discussed in Sierra Club v. Morton, *supra*.

Surely, such an economic interest satisfies the tests for standing to litigate constitutional violations, recently announced again in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). This economic interest gives both plaintiff corporations "a personal stake in the outcome of the controversy." Sierra Club v. Morton, *supra* at 732, 92 S.Ct. at 1364, quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Further, this dispute will be presented in the necessary "adversary context" to insure the existence of a "case or controversy" under Article III of the United States Constitution. The whole history of the proposed development of Park View Heights apartments and the Black Jack residents' opposition to the apartments' location demonstrates that the plaintiffs and defendants are active adversaries. See, Sierra Club v. Morton, *supra* at 732, 92 S.Ct. 1361, *citing* Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Moreover, the dispute will be presented in a form capable of judicial resolution. The remedy requested—an invalidation of a zoning ordinance —does not involve the difficulties of judicial manageability which were present in Baker v. Carr, *supra*. See Sierra Club v. Morton, *supra* at 732, 92 S.Ct. 1361, *citing* Flast v. Cohen, *supra* at 101, 88 S.Ct. 1942.

The decision in this case does not open new ground. Corporate plaintiffs have been given standing by other federal courts in similar actions with nearly identical plaintiffs.[5]

■ Second, Park View and ICUA have the right to raise violations of the constitutional rights of individuals who desire to move into the apartments. This Circuit faced a similar question in Brewer v. Hoxie School District No. 46, 238 F.2d 91, 104 (8th Cir. 1956).

There, the plaintiffs, a consolidated school district, its director and the superintendent, sued for a declaratory judgment and an injunction against various defendant organizations to prevent them from interfering with the plaintiffs' attempts to desegregate their school district. This Court allowed the plaintiffs to assert the rights of the school children under the equal protection clause of the Fourteenth Amendment. Although the *Brewer* Court did find that the plaintiffs had a federal right in their personal capacity to be free from interference in upholding their oaths of office and constitutional duty to accord equal protection of the laws to all persons in their operation of the Hoxie schools, it also held that the plaintiffs could assert the rights of the school children under the Fourteenth Amendment. The Court said:

"Though generally speaking, the right to equal protection is a personal right of individuals, this is 'only a rule of practice', Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586, which will not be followed where the identity of interest between the party asserting the right and the party in whose favor the right directly exists is *sufficiently close.*"

Brewer v. Hoxie School District No. 46, *supra* at 104 (emphasis added).

The determination required by *Brewer* is whether or not the interest of the individual plaintiffs to be free from discriminatory housing practices (the alleged discriminatory zoning of Black Jack) is *sufficiently close* to the interests of Park View and ICUA to give the latter standing. The interests of the corporate and individual plaintiffs coincide because both desire to be free from the discriminatory zoning. If such zoning did not exist, Park View and ICUA would be able to fulfill their purpose of

5. See, Kennedy Park Homes Ass'n v. City of Lackawanna, N. Y., 436 F.2d 108 (2nd Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, Oklahoma, 425 F.2d 1037 (10th Cir. 1970); Southern Alameda Span. Sp. Org. v. City of Union City, Cal., 424 F.2d 291 (9th Cir. 1970); Sisters of Prov. of St. Mary of Woods v. City of Evanston, 335 F.Supp. 396 (N.D.Ill.1971); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga. 1971).

building racially integrated rental housing in a better economic, educational, and recreational environment, and the individual plaintiffs would be able to live in the apartments. The identity of interests between Park View and ICUA on the one hand in providing low-rent, quality housing, and of the individual plaintiffs on the other in their right to live in such housing and be free from discriminatory housing practices, is not only *sufficiently close*, so as to satisfy the *Brewer* test, but intimately close.[6] Therefore, the corporate plaintiffs can assert the rights of the individual plaintiffs who in their own right, have standing to sue.

■ (3) We believe that the corporate plaintiffs also have the standing to question certain alleged statutory violations. Following the above application of *Baker* and *Brewer*,[7] the corporate plaintiffs can assert the individual plaintiffs' civil rights under 42 U.S.C. §§ 1981 and 1982, and the individual plaintiffs can assert their own civil rights under the same sections. See, Kennedy Park Homes Ass'n v. City of Lackawanna, N. Y., 436 F.2d 108 (2nd Cir. 1970), cert. denied 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, Oklahoma, 425 F.2d 1037, 1038–1039 (10th Cir. 1970);

Sisters of Prov. of St. Mary of Woods v. City of Evanston, 335 F.Supp. 396 (N.D. Ill.1971).

■ We also hold that both the corporations and the individuals can litigate the violations of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., since 42 U.S.C. § 3615 states that:

" * * * any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."

See, Sisters of Prov. of St. Mary of Woods v. City of Evanston, *supra* at 405.

We do not find, and neither has counsel specifically directed us toward, any specific provision that would allow a challenge against a zoning ordinance under 42 U.S.C. § 2000d or 42 U.S.C. § 1401 et seq. See, Sisters of Prov. of St. Mary of Woods v. City of Evanston, *supra* at 405, for a similar resolution under 42 U.S.C. § 2000d.

■ (4) The District Court dismissed the eight individual plaintiffs in the case on the ground that, as to them, the issues in the case were not "ripe" for judicial determination.[8] The plain-

---

6. Sierra Club v. Morton, *supra* at 732, 92 S.Ct. 1361; Baker v. Carr, *supra* at 732, 82 S.Ct. 691.

7. Although we are now dealing with standing under statutory violations, the tests of Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) and Baker v. Carr, *supra*, still apply. We are not dealing with statutory violations that require "[certain] public officials to perform certain functions according to the law," Sierra Club v. Morton, *supra* at 732, 92 S.Ct. at 1364, as was the case in Sierra Club v. Morton, *supra;* Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); and Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

8. The District Court said:
   "Assuming, but not deciding that the individual plaintiffs bringing this class action have standing to attack this local ordinance, unlike the Park View Heights Corporation who may be immediately in-

jured by the zoning ordinance, this class seeks relief where no case or controversy has yet arisen.
   "This ordinance on its face does not prohibit moderate or lower income families including blacks from owning or residing in any of the type structures permitted under this zoning law; therefore, of its own force this enactment does not prohibit this class from residing in the City of Black Jack. This court can find no civil rights case in which a court has entertained jurisdiction of a complaint attacking a zoning ordinance, nondiscriminatory on its face prior to its unconstitutional use. Plaintiffs make no allegation that defendants in reliance on this ordinance have prohibited the construction of a building with the effect or intent of prohibiting members of this class from residing in Black Jack. The defendants have never refused to consider rezoning of the site of the Park View Heights development, or refused to issue a build-

tiffs and defendants are in agreement as to the general principles which must be applied to the question of ripeness and they rely primarily on the same cases in their respective briefs. Both cite and quote Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937):

> "A 'controversy' in this sense must be one that is appropriate for judicial determination. * * * A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. * * * The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

*Id.* at 240–241, 57 S.Ct. at 464.

Where the parties differ, of course, is in the application of these principles to the particular facts of this case.

Ultimately, as so often is the case, the test of ripeness involves the balancing of interests. Mr. Justice Harlan stated:

> "The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).[9]

As to the first factor, we believe that the issues are appropriate for judicial consideration at this time. As set out in Aetna Life Ins. Co. v. Haworth, *su-*

*pra,* the issues must be concrete, not based on a hypothetical state of facts, and capable of ending in a judicial decree of a specific character. This case meets those tests. The facts in this case can in no way be considered to be other than concrete. The record discloses that ICUA has purchased the land and assigned it to Park View. The architectural and engineering plans are complete and the corporation has received a financing commitment from the Department of Housing and Urban Development. The actions by the defendants, which the plaintiffs allege are discriminatory, are complete—not merely proposed; and the defendants can do no more to exclude these plaintiffs from the community. As near as one can determine from the pleadings in this case, the plaintiffs need only to resolve this zoning controversy to begin construction of the apartments.

This case is distinguishable from United Public Workers of America v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). There, the defendants contended that certain of the plaintiffs lacked the requisite concreteness to allow judicial determination. This case involved an attack on the Hatch Act by certain government employees who alleged generally that they wished to engage in activities on behalf of candidates for public office. They were found to have not presented a justiciable controversy, the Court being reluctant to pass on the question without knowing precisely the conduct which allegedly would violate the law. In this case, we know the conduct intended by the plaintiffs, as well as the actions which have been taken by the defendants. There is no impediment to judicial determination of these issues.

ing permit, nor have they stopped anyone while erecting a building on this site. This is not a question of exhaustion of remedies, as the plaintiffs' arguments assume, but is rather a situation in which there has been no conflict between the rights of individual plaintiffs and the actions of the defendants, giving rise to a real and sub-

stantial controversy. Defendants have not by merely enacting this ordinance denied any members of this class their constitutional rights."

9. The test is apparently taken from Mr. Justice Frankfurter's concurring opinion in Joint Anti-Facist Refuge Committee v. McGrath, 341 U.S. 123, 156, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

As to the appropriate judicial relief, the plaintiffs ask only that the defendants be enjoined from enforcing the zoning ordinance against this project or otherwise interfering with it. This is the sort of relief that courts have traditionally granted in equity cases and meets the "specific character" test set out in *Aetna Life*. The case is an appropriate one for judicial determination.

The second factor in the test of ripeness set out in *Abbott Laboratories*—the hardship to the parties of withholding judicial consideration—compels an immediate resolution of this controversy. The corporate plaintiffs allege that severe economic consequences are suffered by them each day this project is postponed in the nature of the rising costs of construction. The individual plaintiffs have presented a strong case for consideration at this time. They allege that they are subject to the serious consequences of segregation in housing and education, as well as the economic consequences of decreasing access to jobs due to their inability to escape from the inner city.[10]

The statistics cited by the plaintiffs indicate a great need to provide low and moderate income housing in the suburban areas, a need which Park View and ICUA are trying to fill. Any attempt to interfere with this program may work a visible and immediate hardship on the class of low and moderate income citizens of the City of St. Louis.

This case obviously meets both of the criteria set out in *Abbott Laboratories*; and with respect to the individual plaintiffs as well as the corporate plaintiffs, it is ripe for judicial consideration.

There is some suggestion that the fact that the City of Black Jack has taken no action directly aimed at the project prevents this from being a justiciable controversy. This misconstrues the allegations contained in the complaint. The plaintiffs contend that the incorporation and the subsequent adoption of the zoning ordinance were aimed directly at the Park View apartments, and that these are unconstitutional actions by the city. There is no doubt but that the zoning ordinance forbids the building of these apartments. It forbids all apartments. It would be futile to require the plaintiffs to proceed any further at the local level.

We reverse and remand for further proceedings consistent with this opinion.

10. In the area of housing, plaintiffs present statistics which reflect a growing pattern of racial segregation in housing in the St. Louis metropolitan area. The percentage of black residents in the City of St. Louis has increased from 17 per cent to 46 per cent of the city's population in the last 20 years. In St. Louis County, in which Black Jack is located, the percentage of black residents dropped from 4.1 per cent to 2.1 per cent of the population of the county as a whole.

Inability to escape from the inner city likewise makes it more likely that one will reside in older and, therefore, less desirable homes. The emmigration trend has resulted in 95 per cent of all new housing being built in the suburbs. Eighty per cent of the black population of the region lives in homes that are at least 30 years old. Forty-three per cent of the black population lives in housing that is seriously substandard, and 33 per cent in housing that is overcrowded.

In the schools, the segregation is even more apparent. Five per cent of the total enrollment in the county is black; in the City of St. Louis, the enrollment is 64 per cent black. The schools in the ghetto area of north St. Louis are virtually all black.

Living in the city causes decreased employment opportunities also. Between 1951 and 1969, the city lost a total of 37,000 payroll jobs, a decrease of 9 per cent while the payroll jobs in St. Louis County increased by 197,000, an increase of 448 per cent. In manufacturing the county gained 77,000 jobs—an increase of 428 per cent, while the city lost 49,000 jobs—a decrease of 25.7 per cent. In retail trade the county gained 44,000 jobs—an increase of 540 per cent, and the city lost 25,000 jobs—a decrease of 33 per cent.

Unemployment and subemployment are more likely for those living in the inner city. The unemployment rate for the area of north St. Louis City is 12.9 per cent, compared to 2.9 per cent for the area as a whole. Subemployment is 38.9 per cent. These statistics seem to indicate that employment opportunities are increasingly to be found only in those areas where the low and moderate income citizens do not live.