**CLIFTON TERRACE ASSOCIATES, LIMITED, Appellant,**

v.

**UNITED TECHNOLOGIES CORPORATION, et al.**

No. 90–7028.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1990.

Decided April 5, 1991.

Merril Hirsh, with whom Barbara E. Etkind and Christopher Hornig, were on the brief, for appellant. Joseph M. Sellers, Washington, D.C., also entered an appearance for appellant.

Peter F. Healey, with whom Carl T. Rowan, Jr., Washington, D.C., was on the brief, for appellees.

Before EDWARDS, BUCKLEY, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge HENDERSON.

BUCKLEY, Circuit Judge:

Clifton Terrace Associates, Ltd., the owner of Clifton Terrace Apartments, a federally subsidized low-income housing complex in the District of Columbia, appeals from an order of the district court dismissing its discrimination suit against Otis Elevator Company and Otis's parent, United Technologies Corporation (collectively, "Otis"). Clifton Terrace Associates ("Clifton") claims that Otis violated the Fair Housing Act, the Civil Rights Act of 1866 (sections 1981 and 1982), and the District of Columbia Human Rights Act by refusing to negotiate a contract to service the elevators in Clifton Terrace allegedly because the residents of the complex are poor, black, handicapped, or elderly. We conclude that Clifton has failed to allege a cognizable claim under the Fair Housing Act and lacks standing to sue Otis under sections 1981 and 1982. In the absence of these federal claims, the district court did not have proper jurisdiction to consider Clifton's cause of action under the D.C. Human Rights Act. For these reasons, we affirm in part and vacate in part.

## I. BACKGROUND

Clifton is part of the Marshall Blackwell Group, an enterprise that owns and manages low- and moderate-income housing. It purchased Clifton Terrace Apartments in 1983. This five-story apartment complex is a federally subsidized housing project whose residents are virtually all black, many of them elderly or disabled. Otis installed six elevators in Clifton Terrace in 1971 and serviced them until 1980 when the previous owner of the apartments terminated the service contract and awarded it to another company. There has never been a service contract between Otis and Clifton.

When Clifton took over the apartments, the elevators required a thorough overhaul, and Clifton avers that it "presumed—and relied on the presumption—" that Otis, as the manufacturer, would provide maintenance services. Complaint for Damages, Declaratory Judgment and Injunctive Relief ¶ 12 (filed Apr. 14, 1989). In 1983 and 1984 the property manager at Clifton Terrace contacted Otis's sales representative in an effort to get Otis to inspect the elevators and make a proposal for their maintenance. Otis did not do so, allegedly on the ground that its employees were afraid to work at Clifton Terrace and that it had had problems receiving payment for its services prior to 1980. In December 1987 and March 1988, Clifton's division manager allegedly sent letters to Otis requesting service contract proposals, but again Otis did not respond.

Clifton claims that it could not obtain adequate elevator repair services from other companies. It claims that the other contractors it hired proved incapable of maintaining the elevators in safe working order "at a reasonable cost," purportedly because they were "without sufficient access to necessary training, skills and parts." Id. ¶ 14. Clifton avers that Otis caused this problem through an alleged "quasi-monopoly of skilled and competent servicing of its own elevators," effectively created "[b]y its control and pricing of replacement parts and repair manuals, its training practices, its express warranty

practices, and other business practices." *Id.* ¶ 15.

On September 20, 1988, a principal of Clifton, George F. Marshall, telephoned Otis's district service manager to request a proposal for the repair of the elevators. According to Clifton, Otis promised to provide an inspection and repair proposal within two weeks but failed to do so. Mr. Marshall states that although he discussed creditworthiness with Otis's service manager on September 20, he had no reason to believe that Otis's decision to submit a proposal was contingent on credit verification or anything else. Declaration of George F. Marshall, June 22, 1989, ¶ 13.

On December 6, 1988, the D.C. Elevator Supervisor ordered at least two of the Clifton Terrace elevators shut down because of disrepair and directed Clifton to make them operational. Having heard nothing further from Otis, Mr. Marshall sent a letter to a number of executives and other officials at Otis on December 16. In the letter, Mr. Marshall complained about Otis's failure to follow through on its commitment and charged that the company had "redlined" Clifton Terrace because its residents were mostly poor and black. App. 22a.

Mr. Marshall further asserted that the question of credit was a "spurious" attempt to divert attention from Otis's refusal to provide service; that by capitalizing on the widespread belief that maintenance by Otis personnel was required to "protect" the warranty on Otis elevators, Otis had engaged in an "unfair restraint of trade" inhibiting Clifton's ability to obtain services from other elevator contractors; that the residents of Clifton Terrace had suffered substantial damages as a result of Otis's refusal to maintain the elevators; and that, if necessary, Clifton would pursue legal action under the discrimination laws. *Id.* at 22a–24a. He added:

> We do not wish a quote on the cost of repairing the elevators. To the contrary, we simply ask that they be repaired promptly so that the damages will at least not continue. When the elevators are operational, we can at that time discuss who owes who what.

*Id.* at 23a.

Finally, Mr. Marshall warned Otis about the risk of adverse publicity and high litigation costs:

> Because of its history, Clifton is highly visible and is regularly and prominently featured in The Washington Post. The mayor of Washington's ex-wife, who was involved with the property before its purchase by the present Owner, was sentenced to prison for actions related to Clifton Terrace. If the Owner is forced to go to court, there is a great possibility of adverse publicity as well as the expense of defense and the cost of award and/or settlement.

*Id.* at 24a.

In a December 23 letter from its associate counsel, Stephen B. Swigert, Otis responded to Mr. Marshall by stating that any decision to do business with Clifton would be based on the economics of the transaction and the terms and conditions of the contract, including adequate assurances that Otis would be paid for its work, that it would make a reasonable profit, and that its employees would have safe working conditions. Otis indicated that more extensive credit information was needed because of its past experience with Clifton Terrace. The letter added that Otis's district service manager had requested such information but had not received it. Otis concluded by stating, "If you are interested in having Otis perform elevator work, please contact the undersigned." *Id.* at 77a.

On January 4, 1989, Mr. Marshall called Mr. Swigert to ask how soon Otis could visit Clifton Terrace to inspect the elevators. Mr. Marshall insists that he made it clear in this conversation that Clifton was prepared to meet any reasonable conditions regarding financial and safety requirements, and he claims that Otis promised to arrange for an elevator inspection by January 9. *See* Marshall Decl. ¶ 16.

On January 10, having received no communication from Otis, Mr. Marshall sent another letter. In it, he acknowledged that

Otis required assurances on safety and indemnification before repairing the elevators and that Mr. Swigert had agreed to prepare the proposed assurances for Clifton's review. Mr. Marshall stated that any discussions about such assurances should not hold up the inspection, and he offered to provide a guard, if necessary, to assure the safety of Otis's inspectors. He enclosed with the letter a bank loan commitment that Clifton had obtained to cover the elevator repairs. Mr. Marshall signed off with the following warning: .

> Otis's reluctance to do this work is demonstrating the truth of our earlier contention that Otis is unlawfully and discriminatorily refusing to maintain these elevators. If the elevators require expensive repairs, and if those repairs were required because of Otis's refusal to provide maintenance, then Otis is liable for the cost of the repairs and for other damages.

App. 26a.

In response, Otis sent Clifton a letter stating that Otis was prepared to do business in all types of buildings provided it had a satisfactory contract and adequate assurances of its employees' safety and informing Clifton that Otis had often serviced elevators in subsidized housing projects. But, Otis stated, "We cannot do business with someone who has repeatedly threatened litigation against us. This situation is not conducive to a sound contractual relationship. Consequently, we see no purpose in continuing our discussions with you." *Id.* at 27a.

Clifton filed suit in April 1989, claiming that Otis's refusal to repair and service the Clifton Terrace elevators was unlawful under the Fair Housing Act (Title VIII of the Civil Rights Act of 1968), as amended, 42 U.S.C. §§ 3601–3619 (1988); the Civil Rights Act of 1866, as reenacted, 42 U.S.C. §§ 1981, 1982; the D.C. Human Rights Act of 1977, D.C.Code § 1–2501 *et seq.* (1981 & Supp.1987); the D.C. Consumer Protection Act, D.C.Code § 28–3901 *et seq.;* and various common law principles. Clifton alleged that "[t]he purpose and effect of [Otis's] refusal to deal is to discriminate against

the residents of Clifton Terrace," Complaint at 2, and that Otis "does not refuse service, fail to follow through on business requests, or demand unreasonable assurances with regard to housing accommodations whose residents are predominantly white, or whose residents are not government assisted, or which are located in predominantly white or upper income neighborhoods," *id.* ¶ 27.

Clifton purportedly brought the suit "on behalf of itself and of all the residents of Clifton Terrace, for whom it acts in a fiduciary capacity with regard to obtaining and providing housing-related services." *Id.* ¶ 1. Clifton's claim to a "fiduciary" representation of its tenants was apparently based on the fact that it "is obligated, under the laws and regulations of the District of Columbia, to provide elevator service at Clifton Terrace." *Id.* ¶ 21. Clifton acknowledges "its failure to meet this obligation" and avers that:

> The District of Columbia is threatening to have the repairs done without Clifton's consent by a company Clifton Associates believes is unqualified, thereby threatening future costs and liability to Clifton Associates. The District of Columbia will charge Clifton Associates for such repairs, in an amount Clifton Associates understands and expects will be greatly in excess of the reasonable value of the repairs. [Otis's] refusal to provide service prevents Clifton Associates from meeting its legal obligations to its tenants and to the District of Columbia.

*Id.*

The district court granted Otis's motion to dismiss or in the alternative for summary judgment on all counts. *Clifton Terrace Assocs. v. United Techs. Corp.*, 728 F.Supp. 24 (D.D.C.1990). Clifton appeals only the district court's dismissal of its claims under section 804 of the Fair Housing Act, 42 U.S.C. § 3604, sections 1981 and 1982, and the D.C. Human Rights Act.

## II. DISCUSSION

### A. Fair Housing Act

■ Section 804 of the Fair Housing Act provides in relevant part that

it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges *of sale or rental* of a dwelling, *or in the provision of services or facilities in connection therewith*, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a), (b) (emphasis added). Section 804(f) extends the same protection to the handicapped. *Id.* § 3604(f)(1), (2). Clifton claims that by refusing to deal, Otis is making dwelling units "otherwise unavailable" to Clifton Terrace residents in violation of section 804(a) and (f)(1) and is discriminating "in the provision of services or facilities in connection with the rental of a dwelling" in violation of section 804(b) and (f)(2). Complaint ¶¶ 30–33.

The district court refused to construe the statute so broadly absent any supporting case law. 728 F.Supp. at 29. The court concluded that the language of section 804(a) does not reach Otis's actions because it is clearly confined to discrimination by the providers of housing. *Id.* Based on the language of section 804(b) and its application by other courts, the district court reasoned that this subsection is also directed at providers of housing, such as owners and landlords, and at municipal service providers. *Id.* at 29–30. Because Otis is neither a landlord nor a municipality but simply a private company that offers repair services under contract, the court concluded that Clifton had failed to state a claim under section 804(b). *Id.* at 30.

Clifton argues that the district court's construction of the Fair Housing Act incorrectly creates an exception for discrimination by private vendors of housing services. Otis's alleged refusal to repair the elevators has made housing units "unavailable" for the residents of Clifton Terrace within the meaning of section 804(a) and (f)(1), Clifton contends, because elevators are needed to get to those units and because District of Columbia law requires apartment buildings to maintain working elevators. Furthermore, according to Clifton, working elevators plainly are a service or facility provided in connection with housing, and there is no legal basis for restricting violations of subsections (b) and (f)(2) to the discriminatory provision of such services by housing providers or municipalities.

We agree with the district court that the Fair Housing Act does not cover claims of the type raised by Clifton. Otis does not have a duty under Title VIII to furnish housing services in a nondiscriminatory manner to the tenants of Clifton Terrace. That duty resides primarily with their landlord, Clifton. Clifton cannot so easily convert its statutory duty into a vicarious cause of action against third-party contractors or, as in this case, a would-be contractor.

Specifically, the provisions of section 804 cited by Clifton do not proscribe the conduct alleged here. By their plain terms subsections (a) and (f)(1) reach only discrimination that adversely affects the availability of housing. 42 U.S.C. § 3604(a), (f)(1); *see Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1209–10 (7th Cir.1984). A lack of elevator service is a matter of habitability, not availability, and does not fall within the terms of these subsections.

Clifton notes that the Department of Housing and Urban Development ("HUD") has recently promulgated regulations that interpret 804(a) and (f)(1) to prohibit "any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b) (1990). This proscription includes "[r]efusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance" discriminatorily. *Id.* § 100.70(d)(4). Although the denial of certain essential services relating to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities,

might result in the denial of housing, this interpretation by HUD does not extend the reach of 804(a) and (f)(1) to questions of habitability.

On the other hand, the pertinent clauses in subsections (b) and (f)(2), which do address habitability, are limited to services and facilities provided in connection with the sale or rental of housing. 42 U.S.C. § 3604(b), (f)(2). These subsections are directed at those who provide housing and then discriminate in the provision of attendant services or facilities, or those who otherwise control the provision of housing services and facilities. In the case of rental units, the provision of such services primarily falls under the control of the provider of housing—the owner or manager of the property. We believe this construction is consistent with HUD's interpretation of 804(b) and (f)(2). *See* 24 C.F.R. § 100.65.

The district court cited *Southend Neighborhood* and *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419 (4th Cir.1984), for the proposition that section 804(b) "has also been applied to claims against municipal service providers." 728 F.Supp. at 30. That is not so clear. The court in *Mackey* did pronounce that subsection (b) "encompasses such things as garbage collection and other services of the kind usually provided by municipalities" in holding that the hazard insurance industry is not a provider of services within the meaning of this subsection. 724 F.2d at 424. But *Mackey* gave no authority for its characterization of 804(b) and is of questionable weight on this point. The court in *Southend* relied in turn only on *Mackey* when it repeated this characterization. *See* 743 F.2d at 1210.

Of course, if a municipal government withholds or extends essential city services in a racially discriminatory manner, it violates the equal protection clause of the Fourteenth Amendment. *See, e.g., United Farmworkers of Fla. Hous. Proj., Inc. v. City of Delray Beach*, 493 F.2d 799, 808 (5th Cir.1974). The fact that such a discriminatory practice could have an impact on the use and enjoyment of residential property rights, however, does not necessarily mean that it will also be redressable under Title VIII. *See Vercher v. Harrisburg Housing Auth.*, 454 F.Supp. 423, 424 (M.D.Pa.1978) ("To say that every discriminatory municipal policy is prohibited by the Fair Housing Act would be to expand that Act to a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing opportunities.").

Even if section 804(b) does apply to municipalities, we have little difficulty distinguishing municipal service providers from private service contractors like Otis. Like public utilities, municipalities often are the sole source of a service essential to the habitability of a dwelling. In the case of such an absolute monopoly, ultimate control over the service in question resides with the municipality or utility rather than with the provider of housing, and such a "sole source" could conceivably violate the 804(b) rights of the tenants without any intermediate action by the landlord.

In the present case, Clifton's allegations about Otis's anticompetitive activities, even if true, do not suggest that Otis is the "sole source" of elevator services in the District of Columbia. Indeed, Clifton could not so allege because Clifton has hired the services of other contractors. The fact that Clifton may have incurred higher business costs as a result of Otis's alleged market power cannot make Otis liable under section 804(b) for Clifton's own failure to provide its tenants with adequate elevator service. We express no opinion as to whether the Fair Housing Act could be invoked by tenants where a private contractor that somehow does enjoy "sole source" status in the provision of housing-related services withholds its business because of discriminatory motives.

B. Sections 1981 and 1982

██ Section 1981 provides in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings

for the security of persons and property as is enjoyed by white citizens. . . .

42 U.S.C. § 1981. Section 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

*Id.* § 1982.

The district court expressed "serious concerns" over whether Clifton could properly assert the rights of its residents under these statutes. 728 F.Supp. at 31. But even assuming proper standing, the court concluded that Clifton had failed to establish a *prima facie* case of purposeful discrimination under sections 1981 and 1982. *Id.* at 31–32. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989) (discussing test for *prima facie* showing of discriminatory intent); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (same).

The court found, moreover, that the evidence adduced on summary judgment established that Otis's actions were motivated by legitimate business purposes because Clifton had failed to pursue a potential contract in a commercially reasonable manner and had acted "with a litigious mindset." 728 F.Supp. at 32. Although Clifton argued that a factual issue existed over whether Otis had ever demanded financial and credit information, the court concluded that that dispute did not give rise to a genuine issue of material fact, and summary judgment against Clifton was therefore appropriate. *Id.* at 32–33.

The district court's doubt about Clifton's standing to vindicate its tenants' civil rights was well taken, and we affirm the dismissal of these claims on that ground. Prudential limitations on standing ordinarily require that an action under section 1981 or 1982 be brought by the direct victims of the alleged discrimination because they are best situated to assert the individual rights in question. *E.g., Mackey v. Nationwide Insurance,* 724 F.2d at 421–22; *see Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (a litigant "must assert his own legal interests, rather than those of third parties").

Here, the direct victims of the alleged discrimination are the residents of Clifton Terrace. Clifton is not an association that represents these tenants. Indeed, because the District's Elevator Supervisor has taken action against Clifton for violating its duty as landlord to maintain safe working elevators, Clifton's interests in the subject of this suit to some extent conflict with those of the tenants whose rights it purports to advance. Clifton seeks to shift responsibility for poor elevator maintenance to Otis in the guise of a civil rights claim. The fact that the tenants could have brought their own action against Otis argues against allowing Clifton to assert their rights as a third party, and we refuse to do so.

In support of its argument on prudential standing, Clifton cites cases in which courts have allowed corporate developers of low-income housing projects to bring Civil Rights Act claims to remedy discrimination based on the race of those who are likely to live in the proposed development. *See, e.g., Des Vergnes v. Seekonk Water Dist.,* 601 F.2d 9, 14 (1st Cir.1979); *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208, 1213–14 (8th Cir.1972). These cases differ significantly from the present one, in our opinion, because the direct victims of such preemptive discrimination cannot yet be readily identified, and therefore the developer is in the best position to vindicate their rights. In contrast, the current residents of Clifton Terrace are plainly identifiable. Moreover, the court in *Park View Heights* found that the identity of interests between Park View's developer and his prospective residents was "intimately close," 467 F.2d at 1214, which is certainly not true here.

We therefore conclude that Clifton lacks standing to press these claims. That, however, is not the end of the matter. Clifton cannot revive this action simply by joining individual tenants as plaintiffs in order to

cure its standing defect, for we also affirm the district court's conclusion that, even assuming proper standing, Clifton's allegations concerning intentional discrimination cannot survive summary judgment.

 The plaintiff who alleges racial discrimination under the Civil Rights Act initially must prove by a preponderance of the evidence a *prima facie* case of intentional discrimination. *See Patterson*, 109 S.Ct. at 2378. The burden then shifts to the defendant to present evidence of a legitimate, nondiscriminatory reason for its actions. Once such evidence is offered, the burden swings back to the plaintiff to prove that the defendant's stated reasons are pretextual. *See id.; King v. Palmer*, 778 F.2d 878, 881 (D.C.Cir.1985). To overcome a motion for summary judgment, the plaintiff must at least point to some evidence establishing a reasonable inference that the defendant's proffered explanation is unworthy of credence. *See, e.g., Chauhan v. M. Alfieri Co.*, 897 F.2d 123, 127–28 (3d Cir.1990); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 109 (1st Cir.1988); *see also Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

This burden-shifting framework is meant to eliminate possible legitimate reasons for the defendant's actions and thereby to focus the inquiry on the ultimate question of illegal racial motivation. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). It "was never intended to be rigid, mechanized, or ritualistic ... [but] is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.*

 Evaluating the evidence adduced in the light most favorable to Clifton, we do not believe the record can support a presumption of intent to discriminate. Extrapolating from employment and housing law, Clifton claims that to establish a *prima facie* case of discrimination it need only show that it was in a position to be injured by discrimination against its tenants; that it attempted to obtain elevator service from Otis and was refused; that it was "qualified" to be Otis's customer because it was

willing and able to pay for the service; and that at the time Otis refused to deal, Otis continued to provide service to other customers. Although we are mindful that a discrimination plaintiff's *prima facie* burden is "not onerous," *Patterson*, 109 S.Ct. at 2378, we doubt that Clifton's "ritualistic" formulation is controlling in the present case.

Otis did not in fact refuse to do business with Clifton until after receiving highly inflammatory letters from Mr. Marshall. Regardless of whether Clifton was financially "qualified" or whether Otis continued to provide such service to other customers, no serious presumption of discriminatory intent can be ascribed to Otis after it received Clifton's threatening and belligerent letter of December 16, 1988. And prior to that letter, the only conduct the evidence shows is a failure by Otis to respond with alacrity to Clifton's interest in having its elevators inspected and serviced. Significantly, one of Clifton's affiants offered an explanation for that conduct that is consistent with Otis's own: Clifton Terrace's property manager averred that Otis explained it was reluctant to return to the apartment complex because its employees were afraid to work there and because it had had problems collecting payment for its services. Declaration of Robert Lawrence, June 23, 1989, ¶ 4.

Thus, even if we were to conclude that Clifton had established a *prima facie* case according to its own suggested test, the evidence presented in support of its claim of discrimination is consistent with Otis's proffered reasons for not responding to Clifton's demands for service. Similarly, Clifton has failed to show any evidence that Otis's legitimate business reasons for refusing to deal are not worthy of credence. Hence, we agree with the district court that summary judgment is appropriate. *See Oliver v. Digital Equipment*, 846 F.2d at 109–10.

We reject Clifton's urging at this late hour that the record was inadequately developed for summary judgment on the issue of Otis's motivations. Clifton did not press for further discovery in response to

Otis's motion. Although it did complain that it had been denied discovery into whether Otis customarily requires credit verification from owners of buildings with white residents, Clifton argued to the district court in the same breath that "[t]he evasive behavior of Otis as chronicled in plaintiff's affidavits would readily support a jury determination that the requests for credit information were a mere pretext to disguise the discriminatory refusal to deal." Opposition to Motion for Summary Judgment at 31 (June 23, 1989). Elsewhere, Clifton stated: "We believe the evidence already alleged, even without discovery, would support a jury determination of intent." *Id.* at 27 n. 15.

For these reasons, we find it difficult to conclude that Clifton has made out a *prima facie* case for purposeful discrimination. But, in any event, Clifton certainly has failed to show that Otis's reasons for refusing to deal were pretextual. We therefore affirm the grant of summary judgment for Otis on Clifton's section 1981 and 1982 claims.

## C. Human Rights Act

■ Clifton also appeals the district court's grant of summary judgment on certain parallel claims for intentional discrimination under the "housing and commercial space" provisions of the D.C. Human Rights Act, D.C.Code § 1–2515(a)(4), (6). *See* 728 F.Supp. at 33–34. In the absence of case law from the District of Columbia applying the Human Rights Act to "refusal to deal" claims such as Clifton's, the district court drew an analogy to the employment discrimination context, in which the D.C. Court of Appeals has adopted the same *prima facie* requirements for intentional discrimination that the federal courts apply under sections 1981 and 1982. *See id.* at 33 (citing *United Planning Org. v. District of Columbia Comm'n on Human Rights*, 530 A.2d 674, 677 (D.C.1987)). The court then concluded that summary judgment against Clifton was proper on these claims for the same reasons it was granted on Clifton's Civil Rights Act claims. *Id.* at 34.

In our opinion the district court's ruling was inappropriate. Having found that Clifton had alleged no substantial federal cause of action under the Fair Housing Act or sections 1981 and 1982, the district court lacked a solid basis for subject matter jurisdiction. It was appropriate under the circumstances for the court to dismiss Clifton's Human Rights Act claims for lack of pendent jurisdiction rather than to address the merits of these novel nonfederal claims. *See UMW v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Buethe v. Britt Airlines, Inc.*, 749 F.2d 1235, 1240–41 (7th Cir.1984).

We therefore vacate the district court's grant of summary judgment under the Human Rights Act and order the dismissal of these claims without prejudice. Clifton remains free to bring them in the courts of the District of Columbia. Because Clifton chose not to appeal the dismissal of its remaining nonfederal claims, including certain additional claims under the Human Rights Act, the judgments on those claims must stand.

### III. CONCLUSION

Clifton has failed to allege that it was injured by a discriminatory housing practice within the meaning of section 804 of the Fair Housing Act. Its Title VIII claims were properly dismissed with prejudice. Clifton lacks standing to assert the civil rights of its tenants under sections 1981 and 1982. Furthermore, even if one assumes that Clifton had established a *prima facie* case of intentional discrimination, it did not in any way rebut Otis's justifications for refusing to deal; Otis was therefore entitled to summary judgment with prejudice on these claims. In the absence of any federal claims, the district court had no substantial basis for pendent jurisdiction over Clifton's claims under the D.C. Human Rights Act. The opinion granting summary judgment on these claims is accordingly vacated, and we remand them with instructions that an order be entered dismissing them without prejudice.

*Affirmed in part, vacated in part, and remanded.*

HENDERSON, Circuit Judge, concurring:

I concur in the majority's conclusions and, in large part, in its analysis but I see no need for any discussion of a purported "sole source" theory of liability. Clifton Terrace did not rely on such a theory and our rejection of the Fair Housing Act claim in no way depends on it. That claim cannot be asserted under subsection 3604(a) or (f)(1) because, as the majority states, these provisions "reach only discrimination which adversely affects the availability of housing," while withholding of elevator service "is a matter of habitability, not availability." Subsections 3604(b) and (f)(2), on the other hand, are unavailing because Otis is not among the intended objects of these provisions, namely, as the majority describes them, "those who provide housing and then discriminate in the provision of attendant services or facilities, or those who otherwise control the provision of housing services or facilities." Accordingly, I abstain from the majority's treatment of "sole source."