**John LYNN, individually, and JWL Construction Co., Inc., Plaintiffs,**

v.

**VILLAGE OF POMONA, The Planning Board of the Village of Pomona, P. Joseph Corless, Michael Zrelack, Jr. and Herbert Marshall, Mayor of the Village of Pomona, Defendants.**

**No. 03 CIV. 1726(WCC).**

United States District Court, S.D. New York.

June 10, 2005.

Queller, Fisher, Dienst, Serrins, Washor & Kool, LLP, Attorneys for Plaintiffs, New York, Alan Serrins, Esq., Of Counsel.

Miranda & Sokoloff, LLP, Attorneys for Defendants, Mineola, Michael A. Miranda, Esq., Steven C. Stern, Esq., Of Counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs John Lynn and JWL Construction Co., Inc. (collectively, the "plaintiffs") commenced this action against defendants the Village of Pomona (the "Village"), the Planning Board of the Village of Pomona (the "Planning Board"), and Joseph P. Corless, Michael Zrelack, Jr. and Herbert Marshall (collectively, the "defendants"). Plaintiffs seek relief under Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act" or "FHA"), as amended, 42 U.S.C. § 3612, the New York State Human Rights Law (the "NYSHRL"), N.Y. EXEC. LAW §§ 290 et seq., and the County Human Rights Law, alleging that defendants: (1) intentionally discriminated against plaintiffs by subjecting them to delays with respect to approvals necessary to complete single family homes in the Village because plaintiffs sold certain homes to minorities; and (2) retaliated against plaintiffs for filing a complaint with the

United States Department of Housing and Urban Development ("HUD").[1] Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56 to dismiss plaintiffs' Complaint in its entirety. For the reasons set forth below, defendants' motion for summary judgment is granted.

## BACKGROUND

### I. The Parties

Plaintiff John Lynn is a builder and developer and the President of Lynn Homes, Inc. d/b/a JWL Construction Co., Inc. ("JWL"), a New York corporation. (Complt.¶¶ 8, 9.) In 2000, JWL purchased eighty parcels of land located in a housing development in the Village known as "High Gate Estates." (Defs. Rule 56.1 Stmt. ¶¶ 17, 18.) High Gate Estates is a large subdivision of single-family homes built on a mountain with sloping terrain. (Id. ¶ 16.) Corless is the Village engineer, Zrelack is the Village building inspector and Marshall is the Mayor of the Village. (Id. ¶¶ 7, 13.)

Plaintiffs purchased the lots in High Gate Estates for approximately $64,000 each. To date, plaintiffs have sold all but twenty-three of the original eighty lots. (Id. ¶¶ 19, 20.) Lynn admits that he made some profit on all of the lots that have been sold, but maintains that he did not make as much profit as he should have due to the delays and obstruction allegedly caused by defendants. (Id. ¶ 24; Pls. Rule 56.1 Stmt. ¶ 24.)

### II. The Steep Slope Law

In 1998, increasing concerns regarding the dangers associated with building homes on mountainous terrain caused the Village to enact a law known as the "Steep Slope Law" (the "Steep Slope Law" or the

---

1. This Court has jurisdiction pursuant to 28    U.S.C. §§ 1331, 1367 and 42 U.S.C. § 3612.

"Law"). (Defs. Rule 56.1 Stmt. ¶¶ 59, 62.) Specifically, the Village was concerned that rocks and other debris loosened in the construction of homes on the mountainside might create a danger to the existing homes below. (*Id.*) The Steep Slope Law was designed to establish a procedure for dealing with construction on some of the more dangerous steep slope areas in the Village. (*Id.* ¶ 60.) The stated intent of the Steep Slope Law is to " 'incorporate the consideration of steep slope protection into the Village's existing land use and development approval procedures in conjunction with the procedures of the New York State Environmental Quality Review Act." ' (*Id.* ¶ 64 (quoting Village Code § 119–7).)

The Steep Slope Law defines a steep slope as:

> [a]ny geographical are [sic] proposed for disturbance, whether on a single lot or not, having a typographical gradient of 15% more or greater (ratio of vertical distance to horizontal distance), with a minimum horizontal dimension of 10 feet, and a minimum area as defined below, whether man-made or natural, and whether created by a retaining structure or not.

(*Id.* ¶ 68 (quoting Village Code § 119–1) (internal quotations omitted).) The Steep Slope Law categorizes slopes as either "moderately steep," "very steep" or "extremely steep," and provides guidelines for the issuance of a site development plan permit by the Village, which is necessary to obtain a building permit for homes situated on steep slope lots. (*Id.* ¶¶ 69, 70 (quoting Village Code §§ 119, 119–3).)

According to the Steep Slope Law, a site development plan permit will be issued only if, *inter alia,* the proposed activity:

[can] be completed without increasing the possibility of creep or sudden slope failure and minimize additional erosion to the maximum extent possible; ... will not adversely affect the preservation and protection of existing wetlands, water bodies, watercourses and floodplains; and ... can be completed in such a way so as not to adversely affect existing, proposed or potential future wells or sewage disposal systems or any endangered species of flora or fauna.

(*Id.* ¶ 71 (quoting Village Code § 119–3).) The applicant has the responsibility of demonstrating that a particular site development plan complies with these review standards before a permit will be issued. (*Id.* ¶ 72.) The Planning Board has the authority to review site development plan permits for areas categorized as very steep and extremely steep slopes. (*Id.* ¶ 73 (quoting Village Code § 119–3).) Permit applications must contain a written statement summarizing the nature of the proposed activity and a site development plan. (*Id.* ¶ 74 (quoting Village Code § 119–5).) According to defendants, every site development plan must be prepared by a qualified professional and contain certain information including: "the topography, including areas of extremely, very and moderately steep slopes; location of proposed structures; location of proposed areas of disturbance; erosion and sediment control; proposed drainage systems, including special erosion control measures; and tree maps and landscape plans." (*Id.* ¶ 75.) [2]

In reviewing a site plan application, the Planning Board is charged with the following functions:

> (a) determining if the application is complete; (b) holding a public hearing;

---

**2.** Plaintiffs agree that all site development plans are required to contain this type of information, but maintain that in actual practice the standards were not uniformly or consistently applied. (Pls. Rule 56.1 Stmt. ¶ 75.)

(c) reviewing the application to determine whether the requirements have been met; (d) requiring posting of a letter of credit as a condition of approval to cover losses or damages resulting from work performed under the permit, in excess of that specified by the permit, or the failure to complete work specified by the permit ("escrow"); (e) approve, approve with conditions, or deny the application within a specified timeframe; and (f) establish conditions of approval deemed necessary by the Planning Board to satisfy the goals, objectives and review standards.

(Defs. Rule 56.1 Stmt. ¶ 76 (quoting Village Code § 119–7).)[3]

The Steep Slope Law enumerates twenty-two different categories of conditions that the Planning Board may impose for approval of site development plans, however, the Planning Board is not limited to these twenty-two categories. (Defs. Rule 56.1 Stmt. ¶¶ 77, 78 (quoting Village Code § 119–7).)[4] One condition that the Planning Board may require is phased site development plan review ("Phased Construction"), which involves dividing the site development plan for a particular property into phases, each requiring a separate written certificate of compliance.[5] (Id.

¶¶ 79, 80, 81.) Some of plaintiffs' lots required Phased Construction.

The Steep Slope Law provides that the Village inspector is not permitted to issue a certificate of occupancy ("CO") until the Village engineer has verified that all work has been completed according to the site plan permit. (Id. ¶ 86 (quoting Village Code § 119–9).)[6] As part of this process, the applicant is required to submit a new plan reflecting the property as it was actually developed (the "as-built plan"), so that the engineer can verify whether the site plan complies with the Village Code. (Defs. Rule 56.1 Stmt. ¶ 87.)[7] The Law also provides that any proposed revision work or other changes to a site plan must be reviewed by the Village engineer. (Id.) If the Village engineer determines that the proposed changes are substantial, a new application must be submitted to the Planning Board. (Defs. Rule 56.1 Stmt. ¶¶ 88, 89 (quoting Village Code § 119–9).)[8]

According to the Steep Slope Law, the Planning Board has the authority to suspend or revoke a site plan permit if the applicant has failed to comply with any of its terms, has exceeded its authority or has failed to carry out the project in the manner set forth in the permit. (Defs. Rule

---

**3.** Plaintiffs agree that the Planning Board is charged with these activities, but maintain that the Planning Board administered its duties in a selective manner. (Pls. Rule 56.1 Stmt. ¶ 76.)

**4.** Plaintiffs maintain that the Planning Board did not always apply the twenty-two categories of conditions of approval. (Pls. Rule 56.1 Stmt. ¶ 77.)

**5.** The Phased Construction concept was added to the Steep Slope Law in 2000, and amended in 2002. (Defs. Rule 56.1 Stmt. ¶¶ 82, 83.) It was enacted in response to various residents' complaints that construction on the mountain was flooding their backyards and placing their children and property in danger. (Id. ¶ 85.)

**6.** Plaintiffs agree that this is what the Law provides, but maintain that the Village inspector, Zrelack, made exceptions to this provision. (Pls. Rule 56.1 Stmt. ¶ 86.)

**7.** Plaintiffs agree, but maintain that not all applicants were required to submit an as-built plan. (Pls. Rule 56.1 Stmt. ¶ 87.)

**8.** Plaintiffs agree that this is what the Law provides, but maintain that proposed changes were not always reviewed, were selectively permitted, and the Village engineer was inconsistent when determining what changes were substantial. (Pls. Rule 56.1 Stmt. ¶¶ 88, 89.)

56.1 Stmt. ¶ 90 (quoting Village Code § 119–9).)[9] The Planning Board also has the authority to direct that a steep slope area be restored to the condition it was in prior to a violation of the Steep Slope Law. (Defs. Rule 56.1 Stmt. ¶ 91 (quoting Village Code § 119–9).)[10] The Steep Slope Law requires, as a safety precaution, that the Planning Board review site plans for lots with driveway slopes that exceed 12.5%, according to the as-built certification. (Defs. Rule 56.1 Stmt. ¶ 99.)[11]

The Steep Slope Law provides a civil penalty of up to $3,000 for anyone who undertakes a regulated activity within a steep slope area without a site plan permit, or who violates, disobeys or disregards any provision of the Law. (Defs. Rule 56.1 Stmt. ¶¶ 92, 93 (quoting Village Code § 119–11).)[12] In addition to a civil penalty, such persons will also be guilty of a Steep Slope Law violation which carries a penalty of up to $2,000, fifteen days imprisonment or both. (Defs. Rule 56.1 Stmt. ¶¶ 95, 96 (quoting Village Code § 119–11).) Any determination made pursuant to the Steep Slope Law may be reviewed in an Article 78 proceeding. (Id. ¶ 98 (quoting Village Code § 119–11).) The Village did not prosecute plaintiffs for any Steep Slope Law violations. (Id. ¶ 97.)

### III. Plaintiffs' Factual Allegations

According to plaintiffs, prior to 2002 Lynn had "minor problems" with Corless, which he testified were the result of "a natural tension between a builder and the Village." (Pls. Mem. Opp. Summ J. at 2–3.) However, plaintiffs maintain that this tension multiplied after Lynn began to contract with minority home buyers in 2002. (Id. at 3.) For example, plaintiffs state that "where it used to take him [Lynn] a week to get a certificate of occupancy issued, it took months." (Id.) According to plaintiffs, Corless began to raise alleged safety concerns with respect to the homes purchased by Lynn's minority customers, but ignored the same with respect to the homes for non-minority purchasers. (Id.) Plaintiffs also maintain that Lynn's similarly situated non-minority purchasers were not required to submit as-built plans to the Planning Board, "nor were they given the 'run-around' that minority purchasers were." (Id.)

Plaintiffs allege that the Village delayed issuing COs for Lynn's minority purchasers for months, while his non-minority purchasers received their COs "in a matter of days," even though similar changes had been made to their homes. (Id.) Plaintiffs also allege that many of Lynn's minority purchasers were required to make multiple visits to the Planning Board where they were "treated so disrespectfully and unprofessionally that some of these home buyers broke down." (Id.) Plaintiffs allege that, after witnessing one such Planning Board meeting, Mr. Wendell Watford, an African–American member of the Planning Board resigned and referred to the allegedly disrespectful way the minority purchasers were treated as a "lynching." (Id.)

According to plaintiffs, Lynn, frustrated with the allegedly disparate treatment be-

---

**9.** Plaintiffs agree that this is what the Law provides, but maintain that the Planning Board "relied upon and was controlled by" Corless. (Pls. Rule 56.1 Stmt. ¶ 90.)

**10.** Plaintiffs agree that this is what the Law provides, but maintain that such authority was selectively enforced. (Pls. Rule 56.1 Stmt. ¶ 91.)

**11.** Plaintiffs maintain that "Corless and/or the Planning Board approved Site Plans for lots with driveway slopes that exceeded 12.5%." (Pls. Rule 56.1 Stmt. ¶ 99.)

**12.** Plaintiffs agree that this is what the Law provides, but maintain that it was selectively enforced. (Pls. Rule 56.1 Stmt. ¶¶ 92, 93.)

tween his minority and non-minority purchasers, filed a HUD complaint in October of 2002.[13] (*Id.*) Thereafter, plaintiffs allege that the Village began to make things more difficult for Lynn with respect to all of his lots, whether they were for minority or non-minority purchasers. (*Id.*) As a result of the HUD complaint, plaintiffs allege that Zrelack issued "Stop–Work Orders" at Corless's request and the Village subjected all of Lynn's purchasers to different standards than the other builders working in High Gate Estates. (*Id.* at 4.) On January 16, 2003, Lynn secretly taped a phone conversation between himself and Zrelack during which they discussed the recently issued Stop–Work Orders and Lynn's HUD complaint. (*Id.*) According to plaintiffs, during the conversation, Zrelack "admitted that if Mr. Lynn would drop his Title VIII Housing Complaint against the Village as part of his proposal, they would okay his proposal and he could get back to work." (*Id.*)

According to plaintiffs, defendants' discrimination, retaliation and scrutiny had the effect of "impeding, delaying, and discouraging minority [home] buyers," causing plaintiffs' to suffer economic losses and Lynn to suffer stress, depression and fatigue. (Pls. Mem. Opp. Summ. J. at 7, 24.)

## IV. *Defendants' Factual Allegations*

According to defendants, the Village is "the most [racially] integrated municipality in the County of Rockland" and from 1991 to 2001 "became almost twice as diverse in terms of its minority integration." (Defs. Rule 56.1 Stmt. ¶¶ 53, 54.) Defendants maintain that African Americans hold many posts in the Village government, including the Planning Board and Board of Trustees. (*Id.* ¶¶ 55, 56.) According to defendants, minority families who live in the Village are very happy there. (*Id.* ¶¶ 57, 58.)

Defendants maintain that as early as 1999, long before Lynn alleges that he began contracting with minority purchasers, Lynn began claiming that the Village was treating him unfairly. (*Id.* ¶ 113.) For example, in approximately 1999, Lynn told another builder, Yitzchak Buchinger, that he found Corless difficult to deal with. (*Id.* ¶ 47; Pls. Rule 56.1 Stmt. ¶ 47.) Defendants also maintain that Lynn told Buchinger that he "was going to try to do something to get Corless out of this Village," and asked Buchinger to "work with him [Lynn] to get Corless out of power." (Defs. Rule 56.1 Stmt. ¶¶ 49, 50.)

According to defendants, in 2002, prior to plaintiffs' alleged sale of certain lots to minority purchasers, the Village required all builders including Lynn to comply with the Steep Slope Law and other Village laws. (*Id.* ¶ 112.) For example, in November 2000, with respect to Lot # C–55, defendants maintain that Corless required Lynn to make several additions to his plan and then told Lynn that the Village would not issue a building permit until he resubmitted a revised site plan to the Planning Board. (*Id.* ¶¶ 120–123.) Additionally, defendants note that while plaintiffs allege that Lynn did not encounter problems with the Village prior to his developing lots for minority purchasers, "most of these [other] lots were not subject to the steep slope law requirements and, therefore, were not required to go through the Planning Board for approvals." (*Id.* ¶¶ 108–111.)

Regarding the lots that plaintiffs allegedly sold to minorities, defendants maintain that plaintiffs' as-built plans did not conform with the respective site plan for each lot. (*Id.* ¶¶ 130, 174, 218.) For example, defendants note that with respect to Lot # G–33, *inter alia*, the as-built plan reflected a driveway slope of 14%, while the approved site plan listed a driveway

---

**13.** Defendants received notice of the HUD complaint in November of 2002.

slope of 12%; the as-built plan reflected that no curtain drain was installed, while the approved site plan included a curtain drain; and the slope at the rear of the property was increased. (*Id.* ¶¶ 131, 132, 133, 134, 144.)

Defendants also maintain that plaintiffs failed to obtain approval for any of the changes to their site plans and that plaintiffs' own engineer, William Stein, acknowledged the substantial deviations. (*Id.* ¶¶ 145, 147, 148.) According to defendants, at an October 10, 2002 Planning Board meeting, it was noted that Lynn was the only builder in High Gate Estates who had deviated from approved site plans without receiving prior permission from the Planning Board. (*Id.* ¶ 156.) Finally, defendants maintain that Corless and the other Village officials were not aware of the race of Lynn's purchasers until after the recommendations were made and they appeared at the various Planning Board meetings. (*Id.* ¶¶ 163, 201, 207.)

Regarding the lots that Lynn allegedly sold to non-minorities and with which he claims to have had difficulty with the Village after filing his HUD complaint, defendants maintain that any Stop–Work Orders that were issued were done so as a result of Lynn: (1) beginning construction without a permit; (2) beginning construction before required site work was completed; (3) continuing construction despite having been issued a Stop–Work Order; (3) intentionally performing work in contravention of the terms of a reinstated building permit; (4) making changes to an approved site plan without seeking approval; and (5) failing to follow a phasing schedule set forth in an approved site plan. Defendants also maintain that some of these Stop–Work Orders were issued prior to the service of the HUD complaint on the Village in November 2002.

**14.** Plaintiffs admit that all builders are subject to the Steep Slope Law, but maintain that

### V. *Other Village Builders*

There are several other builders who have and continue to build homes in High Gate Estates. (Defs. Rule 56.1 Stmt. ¶ 366.) All of the properties developed by these builders were subject to the same Steep Slope Law to which plaintiffs were subject. (*Id.* ¶ 370).[14] According to defendants, all of the builders went through the same process and dealt with the same construction issues that plaintiffs did. (Defs. Rule 56.1 Stmt. ¶¶ 368, 369.) For example, defendants note that on June 24 and 26, 2002, when plaintiffs were issued violation notices for, *inter alia,* lack of erosion control, other builders, including Nanuet Point Estates, Ltd. and Carlton Laromme Associates, Ltd., were issued the same violation notices. (*Id.* ¶¶ 371, 372.) However, plaintiffs maintain that Lynn was treated differently and subject to higher levels of scrutiny and that no other similarly situated builders were issued violations for similar defects. (Pls. Rule 56.1 Stmt. ¶¶ 368, 369, 371.)

### DISCUSSION

### I. *Standard on Motion for Summary Judgment*

Under Fed. R. Civ. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S.

defendants did not always enforce the Law consistently. (Pls. Rule 56.1 Stmt. ¶ 370.)

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994).

## II. *Standing*

Defendants argue that the Complaint should be dismissed because plaintiffs lack standing under § 3604 of the FHA.[15] (Defs. Mem. Supp. Summ J. at 3.) Section 3604 provides, in relevant part, that it shall be unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of [*inter alia*] race .... (b) To discriminate against any person in the terms, condi-

tions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of [*inter alia*] race ....

42 U.S.C. § 3604(a), (b).

Defendants contend that plaintiffs lack standing because defendants did not "make unavailable or deny" any dwellings and were in fact not even in a position to do so because they are neither providers of housing nor municipal service providers. (Defs. Mem. Supp. Summ. J. at 4.) Plaintiffs' claim does not involve provision of services and therefore does not implicate § 3604(b). *See Clifton Terrace Assocs., Ltd. v. United Tech. Corp.,* 929 F.2d 714, 719 (D.C.Cir.1991) (noting that based on the language of § 3604(b) courts have reasoned that it is directed at owners of housing, such as owners and landlords, and municipal service providers). Accordingly, we turn our attention to § 3604(a) and the phrase "otherwise make unavailable." [16]

■ The phrase "otherwise make unavailable," as it is used within the FHA, has been interpreted to reach a wide variety of discriminatory housing practices, including exclusionary or discriminatory zoning decisions. *See LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 424–25 (2d Cir.1995). In fact, " 'the prohibition against making a

---

**15.** Plaintiffs brought the instant action under § 3612 of the FHA, which provides that persons aggrieved under §§ 3603, 3604, 3605, and 3606 of the FHA may bring a civil action. *See* 42 U.S.C. § 3612. It is undisputed that § 3604 is most applicable here. Therefore, plaintiffs' right to bring their "action under § 3612 turns on how the courts have interpreted § 3604." *Puglisi v. Underhill Park Taxpayer Assoc.,* 947 F.Supp. 673, 694–95 (S.D.N.Y.1996).

**16.** Although defendants have not challenged Lynn's rights under the FHA, as a non-minority developer, it is worth noting that the FHA protects not only minorities but also non-minorities who have themselves suffered pal-

pable injury as a result of a defendant's allegedly discriminatory housing practices with respect to third-party minorities. *See Andujar v. Hewitt,* No. 02 Civ. 2223, 2004 WL 691773, *8, 2002 U.S. Dist. LEXIS 14294, at *25–26 n. 7 (S.D.N.Y. Aug. 2, 2002) ("The Supreme Court has made clear that because the Fair Housing Act gives standing to 'aggrieved persons,' membership in a protected class is not required as a prerequisite to sue."). Therefore, " 'as long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed.' " *Id.* (quoting *Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)).

residence unavailable has been applied to situations where government agencies take actions that prevent construction of housing when the circumstances indicate a discriminatory intent or impact against anticipated future residents who are members of a class protected' " under the FHA. *Lopez v. City of Dallas*, No. 3:03 Civ. 2223–M, 2004 WL 2026804, **5–6, 2004 U.S. Dist. LEXIS 18220, at *17–18 (N.D.Tex. Sept. 9, 2004) (quoting *Arbor Bend Villas Hous., L.P. v. Tarrant County Hous. Fin. Corp.*, No. 4:02 Civ. 478–Y, 2002 WL 1285564, *3, 2002 U.S. Dist. LEXIS 10232, at *11 (N.D. Tex. June 6, 2002)); *see also Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 45–46 (2d Cir.2002) (noting that the FHA applies to municipal zoning decisions); *Comer v. Cisneros*, 37 F.3d 775, 789 (2d Cir.1994) (noting that Congress intended § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class, including not only persons who are directly involved in the real estate business, but also those who directly affect the availability of housing, such as state or local governments) (collecting cases).

Consequently, we conclude that plaintiffs' claim that defendants intentionally made it more difficult for and interfered with the ability of their minority purchasers to develop and move into homes in High Gate Estates falls within the meaning of "otherwise make unavailable" and therefore within the ambit of § 3604(a) of the FHA.[17]

■ Furthermore, the Supreme Court has made it clear that the FHA's definition of an "aggrieved person" confers standing as broad as is permitted by Article III of the Constitution and is not restricted by any of the doctrines of prudential standing. *See LeBlanc–Sternberg*, 67 F.3d at 424–25 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375–76, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). Therefore, to avoid dismissal for lack of standing, a plaintiff must allege "distinct and palpable injuries that are fairly traceable to [the defendant's] actions." *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 87–88 (2d Cir.2000) (citations and quotations omitted). Here plaintiffs have satisfied Article III standing because they have sufficiently alleged that they suffered eco-

---

17. We acknowledge that in support of their position defendants cite *Puglisi*, a case within this District. In *Puglisi*, the plaintiff landlord brought an action against a community association and municipal officials under, *inter alia*, the FHA. The court found that the plaintiff lacked standing to bring his § 3612 claim because the actions he complained of, selectively enforcing ordinances, housing codes and zoning regulations, did not fall within the ambit of § 3604(a). 947 F.Supp. at 696. However, in reaching that conclusion the court relied on a case that is clearly factually distinguishable from *Puglisi* as well as the case at bar. Specifically, the *Puglisi* court relied on the *Clifton Terrace Assocs.* case wherein the District of Columbia Circuit held that § 804 (the precursor to § 3604) did not apply to the defendant, a private elevator services repair company, because "a lack of elevator service is a matter of habitability, not availability." *Clifton Terrace Assocs.*, 929

F.2d at 719. Additionally, we have not found any other cases within the Second Circuit supporting the conclusion reached in *Puglisi*, and no other cases have cited *Puglisi* for this conclusion. Furthermore, several Second Circuit cases both before and after *Puglisi* indicate a contrary position. *See Reg'l Econ. Cmty. Action Program*, 294 F.3d at 45–46 (noting that the FHA applies to municipal zoning decisions); *LeBlanc–Sternberg*, 67 F.3d at 424 (noting that the phrase " 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restriction"); *Comer*, 37 F.3d at 789 (noting that § 3604 is intended to reach not only those who are directly involved in the real estate business, but also those who directly affect the availability of housing such as state or local governments). Consequently, we do not agree with defendants that *Puglisi* is persuasive, let alone controlling, in the case at bar.

nomic losses and other hardships as a result of defendants' allegedly discriminatory application of the Steep Slope Law, and now seek to recover this loss.[18] Having determined that plaintiffs have standing to bring their claims pursuant to the FHA, we will now address defendants' substantive arguments with respect to each of plaintiffs' claims.

### III. *Plaintiffs' Discrimination Claim*

The FHA makes it unlawful for any person to refuse to sell or otherwise make unavailable a dwelling to any person because of, *inter alia,* race. 42 U.S.C. § 3604(a). Section 3604(a) of the FHA provides, in relevant part, that it shall be unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

Plaintiffs allege that defendants have "subjectively and selectively" administered the " 'Steep Slope' and 'Phased Construction' Rules and Regulations with an intent to discourage minority families from obtaining residence in High Gate Estates" and "as a tool, selectively applied to harass and obstruct Mr. Lynn's construction of homes for minority home buyers and to retaliate against Mr. Lynn." (Complt.¶¶ 17, 18.)

It is well-settled that claims of intentional discrimination, i.e., disparate treatment, under the FHA are analyzed under the familiar burden-shifting standard applicable to Title VII discrimination claims first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1038 (2d Cir. 1979); *see also Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003). According to this standard, plaintiff must first make out a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. If plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to assert a legitimate, non-discriminatory reason for the decision. *Id.* If defendant articulates such a reason, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action. *Id.* If the court determines that no reasonable jury could find that the defendant's actions were motivated by discrimination, then summary judgment is appropriate. *See Mitchell,* 350 F.3d at 47 (citing *Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir.2000)).

To establish a *prima facie* case for disparate treatment under § 3604(a), plaintiffs must show that: (1) they contracted with persons who are members of a class protected by the FHA;[19] (2) those persons sought and were qualified to purchase the housing in question; (3) defendants "otherwise made unavailable"[20] or

---

**18.** Because we have determined that plaintiffs have sufficiently alleged "injury in fact" as is required by Article III of the Constitution, it is not necessary to further address defendants' alternative argument that plaintiffs lack standing because they have not been damaged.

**19.** As stated *supra,* in Part II., "non-minority developers do have standing to assert their own right to challenge allegedly racially motivated adverse zoning decisions by local governmental officials." *Baytree of Inverrary Re-*

*alty Partners v. Lauderhill,* 873 F.2d 1407, 1409 (11th Cir.1989) (collecting cases); *see also Sullivan v. Salem,* 805 F.2d 81, 82 (2d Cir.1986).

**20.** As stated *supra,* in Part II., "[t]he prohibition against making a residence 'unavailable' has been applied to situations where governmental agencies take actions that prevent construction of housing when the circumstances indicate a discriminatory intent or impact against anticipated future residents

refused to sell the housing to those persons; and (4) the housing opportunity remained available to other purchasers. *See Mitchell,* 350 F.3d at 47 (citing *Robinson,* 610 F.2d at 1038). In other words, plaintiffs must demonstrate that other builders, who are situated similarly to plaintiffs, were treated differently by defendants on the basis of race. *See Cabrera v. Jakabovitz,* 24 F.3d 372, 390 (2d Cir.1994) ("As long as a plaintiff can prove that a defendant afforded an African–American person fewer housing opportunities than a similarly-situated White person on account of race, the plaintiff has made out a case under Title VIII."); *see also Huntington Branch, NAACP v. Huntington,* 844 F.2d 926, 933–934 (2d Cir.1988) (noting that disparate treatment analysis involves differential treatment of similarly situated persons or groups).

In support of the present motion defendants contend that plaintiffs are unable to establish a *prima facie* case for disparate treatment under the FHA because: (1) plaintiffs are unable to show that other similarly situated builders were treated differently; and (2) even if other similarly situated were treated differently, that plaintiffs are unable to show that such selective treatment was based on plaintiffs' sale of homes to minorities. (Defs. Mem. Supp. Summ. J. at 8.) First, we will consider whether there is any evidence of differential treatment of similarly situated builders.

Plaintiffs claim that other lots built by Lynn and other similarly situated builders and sold to non-minority families, with similarly situated topography as the lots Lynn sold to minority families, were not subject to the same level of scrutiny by defendants. (Complt.¶ 20.) Plaintiffs also claim that such lots "were constructed in variance from their original (village approved) site plans" but nonetheless received COs "without any Village Planning Board intervention." (*Id.* ¶ 21.)

Defendants maintain that plaintiffs, along with all builders in High Gate Estates, "were required to comply with the mandates of the Steep Slope Law, and in particular, follow the site plans that had been approved by the Village." (Defs. Mem. Supp. Summ. J. at 1.) Defendants also contend that it is undisputed that Lynn did not follow the approved site plans. (*Id.* at 2.) Finally, defendants maintain that plaintiff is unable to identify similarly situated builders who failed to follow site plans and who were subsequently ignored by the Village. (*Id.*)

Plaintiffs cite four lots in High Gate Estates that they maintain were developed by similarly situated builders, and treated differently by defendants than Lynn's allegedly similar lots which were sold to minorities. (Pls. Mem. Opp. Summ. J. at 15–17.) We will discuss each lot separately.

### A. Lots ##C–46 and C–47

According to plaintiffs, Lot # C–47, which was developed by Menna Construction, was of similar topography and adjacent to Lynn's Lot # C–46. (*Id.* at 15.) Plaintiffs claim that Lynn was required to obtain health department approval for the sewage ejector pump on Lot # C–46, but that defendants did not require the same of Lot # C–47. (*Id.*) Plaintiffs also claim that Corless did not require Planning Board approval for Lot # C–47, but that Lot # C–46 was subject to nine months of delay before a CO was issued. (*Id.*) Plaintiffs provide no support, other than Lynn's own deposition, for these allegations. (*Id.*)

who are members of a class protected under the Act [the FHA]." *Arbor Bend Villas Hous.,*

2004 WL 691773, **3–4, 2002 U.S. Dist. LEXIS 10232, at *10–12.

On the other hand, defendants provide direct evidence to support their position. Notably, defendants first point out that unlike plaintiffs' Lot # C–46, Lot # C–47 is not a Steep Slope lot, and therefore is not required to obtain Planning Board approval. (Corless Aff., Exs. B, C.) This alone indicates that Lots ## C–46 and C–47 are not similarly situated. However, defendants also note that Lot # C–47 was, in fact, required to obtain the same approval for the sewage ejector pump, as plaintiffs were for Lot # C–46. (Miranda Reply Decl., Ex. D.) Further, defendants note that any delays plaintiffs experienced with respect to Lot # C–46 were a result of their having to return to the Planning Board after the Village noted at least fifteen unapproved changes to the site plan. (Defs. Mem. Supp. Summ J., Ex. U–7.) Accordingly, plaintiffs have failed to establish that Lot # C–47 was similarly situated and treated differently.

### B.  *Lots ##C–51 and H–14*

According to plaintiffs, Lot # C–51 was developed by Avi Davi Life Style Builders, sold to a non-minority family and is situated similarly to plaintiffs' Lot # H–14, which was sold to a minority family. (Pls. Mem. Opp. Summ. J. at 15.) Plaintiffs claim that, although there were numerous changes made to the site plan for Lot # C–51, there was no required Phased Construction or Planning Board involvement. (*Id.*) Plaintiffs also claim that they were required to install certain items for Lot # H–14 such as catch basins and chain link fences and show them on site plans, but that Lot # C–51 was not subject to similar scrutiny. (*Id.* at 15–16.)

Again, defendants note that, unlike Lot # H–14, Lot # C–51 was not a Steep Slope lot and therefore was not required to go to the Planning Board or to comply with the mandates of the Steep Slope Law. (Corless Aff., Ex. D.) This alone indicates that Lots ## H–14 and C–51 were not similarly situ-

ated. Furthermore, defendants have submitted evidence which demonstrates that Lot # C–51 was, in fact, subject to some scrutiny. (Defs. Rule 56.1 Stmt. ¶¶ 374–78; Miranda Reply Decl., Ex. E.) For example, the site plan was revoked as a result of a lack of erosion control and stone-wheel clean-out and a Stop–Work Order was issued for lack of erosion control. (Defs.Mem.Supp.Summ. J., Ex. BB–2.) Additionally, defendants note that another Avi Davi lot, Lot # G–19, was issued two Stop–Work Orders in September 2002 for performing work without a permit. (*Id.*, Exs. BB–5, BB–6.) Accordingly, plaintiffs have failed to establish that Lot # C–51 was similarly situated and treated differently.

### C.  *Lot # G–34*

Plaintiffs allege that Lot # G–34, which was developed by Menna Construction and sold to non-minority purchasers, had significant changes to the site plan, i.e., the grade of the driveway went from 10% to 12.5% and the slab was raised 3%. (Pls. Mem. Opp. Summ. J. at 16.) Plaintiffs claim that despite these changes, Lot # G–34 was not required to make a second visit to the Planning Board. Additionally, plaintiffs claim that certain items were not required for Lot # G–34, such as a chain link fence, a slope blanket and curtain drains. (*Id.*)

Defendants agree that the driveway slope for Lot # G–34 changed from 10% to 12.5%, but note that this change was of no consequence because a 12.5% driveway slope is permissible under the Village Code. (Defs. Reply Mem. Supp. Summ J. at 14.) The Steep Slope Law provides that only driveways with slopes of greater than 12.5% are subject to approval by the Planning Board. (*Id.*) Further, defendants maintain that Corless met with Menna Construction throughout the building

process to discuss any proposed changes, and that Corless considered these changes minor and reasonable under the circumstances. (Corless Dep. at 122–23.) Defendants also note that Lot # G–34 was issued a violation notice on June 26, 2002 for lack of erosion control and stone-wheel clean-out. (Miranda Reply Decl., Ex. F.) Accordingly, plaintiffs have failed to establish that Lot # G–34 was similarly situated and treated differently.

### D. Lot # I–8

Plaintiffs allege that Lot # I–8, which was owned by Yitchak Buchinger, was afforded preferential treatment because, despite significant changes to the site plan, Buchinger was not required to return to the Planning Board for a second approval. (Pls. Mem. Opp. Summ. J. at 16.)

However, the evidence submitted by defendants indicates that it took over one year and at least five separate Planning Board meetings for Buchinger to obtain site plan approval for Lot # I–8. (Defs. Mem. Supp. Summ J., Exs. U–1–U–6; Corless Dep. at 220; Buchinger Dep. at 48.) In fact, defendants maintain that Lots ## I–8 and I–7, another Buchinger lot, were scrutinized by the Planning Board more than any other lot in High Gate Estates. (Defs. Mem. Supp. Summ. J. at 15.) Defendants also note that Buchinger was before the Planning Board for almost one year to discuss issues related to drainage, slope stabilization, and erosion, and that he was required to erect a retain-

ing wall in the rear of the property before any other work was completed. (Id., Ex. U; Buchinger Dep. at 48.) Further, the Planning Board itself made two visits to Lots ## I–7 and I–8 before the site plans were approved. (Defs. Rule 56.1 Stmt. ¶ 444.) Accordingly, plaintiffs have failed to establish that Lot # I–8 was similarly situated and treated differently.

Based on the evidence submitted by both parties, we are unable to conclude that plaintiffs have identified any lots developed by other builders which were similarly situated and treated differently. Irrespective of plaintiffs' allegations, defendants have demonstrated that there are no material issues of fact regarding any of the aforementioned lots. Accordingly, plaintiffs have failed to establish a *prima facie* case for disparate treatment in violation of § 3604(a), and we need not consider whether plaintiffs can link any disparate treatment to race.[21]

However, the Court's dismissal of plaintiffs' discrimination claim does not automatically require dismissal of plaintiffs' retaliation claim. *See Marks v. Bldg. Mgmt. Co., Inc.*, No. 99 Civ. 5733, 2002 WL 764473, **10–11, 2002 U.S. Dist. LEXIS 7506, at *32–33 (2d Cir. Apr. 26, 2002) (noting that "a meritorious claim under § 3604 is not a prerequisite to a retaliation claim under § 3617" and therefore the fact that a plaintiff fails to establish her discrimination claim does not shield the defendant from liability under § 3617) (cita-

---

**21.** It should be noted that even if we had found some evidence of disparate treatment, plaintiffs have not submitted sufficient evidence to rebut defendants' evidence demonstrating that defendants were not aware of the race, or even the identities, of plaintiffs' purchasers until after plaintiffs were "called to task" for failing to comply with the approved site plans for these lots. (Defs. Mem. Supp. Summ. J. at 9–13.) Plaintiffs rely on the deposition testimony of Wendell Watford, an African–American member of the Planning

Board, in which he referred to the Planning Board meeting involving one of plaintiffs' lots as a "lynching." (Pls. Mem. Opp. Summ J. at 16.) However, Watford testified that his use of the word "lynching" to describe the tone of the Planning Board meeting was not intended to have racial connotations. (Watford Dep. at 114.) Rather, Watford stated that he used the word in "other than racial terms .... I simply used the term in order to express the severity of what I had observed." (Id.)

tions omitted). Accordingly, we will now consider plaintiffs' retaliation claim.

## IV. *Plaintiffs' Retaliation Claim*

Plaintiffs allege that in retaliation for filing their HUD complaint, defendants began to subject all of Lynn's lots, whether for minorities or non-minorities, to an increased level of scrutiny as compared to similarly situated builders in High Gate Estates. Plaintiffs claim that "as a result of Lynn's opposition to practices he believes were forbidden by the law and the filing of his HUD complaint on October 3, 2002, he has been the victim of an ongoing pattern of retaliation." (Complt.¶ 34.)

Defendants maintain that nothing changed for plaintiffs after they filed the HUD complaint; that they, along with all builders in High Gate Estates, continued to be subject to the Steep Slope Law requirements that they had been dealing with for over two years. (Defs. Mem. Supp. Summ. J. at 21.) Defendants also maintain that plaintiffs are simply using their retaliation theory to minimize the fact that the lots they sold to minorities and non-minorities were treated exactly the same with respect to the Steep Slope Law. (*Id.* at 18.)

The FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by [*inter alia* § 3604] of this title." 42 U.S.C. § 3617.[22] As with FHA discrimination claims, FHA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting standard. *See Reg'l Econ. Cmty. Action Program*, 294

F.3d at 54 (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999)) (citation omitted). Accordingly, plaintiffs must first establish a *prima facie* case of retaliation.

■ To prevail on a claim of retaliation under the FHA, plaintiffs must establish: (1) that they engaged in protected activity by opposing conduct prohibited under the FHA; (2) that defendants were aware of that activity; (3) that defendants subsequently took adverse action against plaintiffs; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action. *See Marks*, 2002 WL 764473, *9, 2002 U.S. Dist. LEXIS 7506, at *29–30 (collecting cases); *see also Reg'l Econ. Cmty. Action Program*, 294 F.3d at 54; *Broome v. Biondi*, 17 F.Supp.2d 211, 218–19 (S.D.N.Y. 1997).

■ Clearly, the filing of plaintiffs' HUD complaint is a protected activity, and defendants do not assert that they were unaware of this activity. *See Reg'l Econ. Cmty. Action Program*, 294 F.3d at 54 (noting that filing a HUD complaint is a protected activity). Therefore, we must determine whether a reasonable jury could find in plaintiffs' favor with respect to the remaining elements of their retaliation claim. First, we will consider whether a jury could reasonably find that defendants' treatment of plaintiffs' lots constitutes an adverse action. Then, if necessary, we will consider whether it could reasonably find a causal connection between such adverse action and the filing of plaintiffs' HUD complaint.

It is well-settled that to bring a retaliation claim under the FHA a plaintiff must

---

**22.** The FHA protects two distinct groups of people, those who are members of a protected class, and those who are not necessarily members of a protected class, but who aid or encourage protected class members in the exercise of their FHA rights. *See Berlickij v. Town of Castleton*, 248 F.Supp.2d 335, 346–47 (D.Vt.2003).

submit evidence of a retaliatory adverse action "of sufficient magnitude to permit a finding of intimidation, coercion, threats or interference." *Marks*, 2002 WL 764473, *12, 2002 U.S. Dist. LEXIS 7506, at *42 (noting that plaintiff had failed to establish a *prima facie* case for retaliation under the FHA because she had not shown that she was actually the victim of any injurious action) (collecting cases).

According to plaintiffs, the adverse action that they suffered as a result of the HUD complaint was that all of their lots were subject to stricter scrutiny that those of similarly situated builders. (Pls. Mem. Opp. Summ. J. at 18.) However, plaintiffs have provided no evidence of such differential treatment, other than that which they submitted in support of their discrimination claim, which we already determined to be insufficient. In fact, the only lot that plaintiffs even mention in their Memorandum of Law in Opposition to the present motion is Lot # I–6. (*Id.*) Plaintiffs claim that defendants issued a Stop–Work Order and revoked the building permit for Lot # I–6 in retaliation for the HUD complaint. (*Id.*) However, plaintiffs submit no evidence to support this claim and even admit that most of these actions took place "well before" they filed the HUD complaint in October of 2002. (Pls. Rule 56.1 Stmt. ¶ 259.) Plaintiffs also admit that the building permit was revoked for failure to comply with Phased Construction. (Pls. Mem. Opp. Summ. J. at 19.) Furthermore, defendants submit evidence demonstrating that any action taken by the Village with respect to Lot # I–6 was a result of Lynn's failure to comply with the Steep Slope Law, i.e., for failure to follow the phasing schedule and continuation of work in contravention of a Stop–Work Order. (Defs.Mem.Supp.Summ. J., Ex. Y.)

Thus, the record demonstrates that all of plaintiffs lots, those sold to minorities and non-minorities both before and after the HUD complaint, were subject to the same level of scrutiny with respect to compliance with the Steep Slope Law. The record also demonstrates that all of the delays that plaintiffs experienced occurred as a result of their own failure to comply with the Steep Slope Law. Additionally, the record is devoid of any evidence tending to show that the other builders in High Gate Estates were afforded any preferential treatment. Accordingly, plaintiffs have submitted no evidence from which a jury could reasonably conclude that their lots were subject to a heightened level of scrutiny following the HUD complaint.

Moreover, the record does not show, or even suggest, that defendants' conduct following the HUD complaint caused plaintiffs to change their behavior or had any chilling effect on plaintiffs' willingness to assert their rights under the FHA. To the contrary, the fact that plaintiffs continued to build and develop lots after November 2002 and plaintiffs' filing of the instant suit, bringing substantially similar claims, indicates just the opposite. Thus, where a plaintiff has neither demonstrated a change in behavior, nor shown that was he "actually chilled" in the exercise of his rights under the FHA, no reasonable jury could find that he suffered an adverse action in retaliation for engaging in protected activity. *See Marks*, 2002 WL 764473, **13–14, 2002 U.S. Dist. LEXIS 7506, at *44–46 (noting that a plaintiff's claim for retaliation must fail where there is no showing that the alleged violation had any actual effect on him) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)).

In light of the foregoing, we must conclude that plaintiffs have failed to establish an essential element of a claim for retaliation under the FHA, i.e., that they suffered a material adverse action. *See Marks*, 2002 WL 764473, *12, 2002 U.S. Dist. LEXIS 7506, at *42 (noting that for a

retaliation claim under the FHA plaintiff must submit evidence of an adverse action "of sufficient magnitude to permit a finding of intimidation, coercion, threats or interference") (quotations and citation omitted). Accordingly, plaintiffs have failed to make out a *prima facie* case, and defendants' motion for summary judgement is granted with respect to plaintiffs' retaliation claim.

The elements of plaintiffs' claims under the NYSHRL and the County Human Rights Law are the same as that under the FHA. Therefore, our above analysis applies equally to those claims and we need not further address them herein. *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 217 (2d Cir.2005); *see also Mohamed v. Marriot Int'l,* 905 F.Supp. 141, 157 (S.D.N.Y.1995).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and the Complaint is dismissed in its entirety, with prejudice but without costs.

SO ORDERED.