Hollandale Apts. & Health Club, LLC v Bonesteel (2019 NY Slip Op 03718)





Hollandale Apts. & Health Club, LLC v Bonesteel


2019 NY Slip Op 03718


Decided on May 9, 2019


Appellate Division, Third Department


Garry, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 9, 2019

526907

[*1]HOLLANDALE APARTMENTS & HEALTH CLUB, LLC, Respondent,
v
MICHAEL BONESTEEL, Appellant, et al., Defendant.

Calendar Date: March 28, 2019

Before: Garry, P.J., Egan Jr., Lynch, Clark and Aarons, JJ.


Disability Rights New York, Albany (Scott M. Wells of counsel), for appellant.
Pentkowksi, Pastore & Freestone, Clifton Park (Michael J. Hutter of Powers & Santola, LLP, Albany, of counsel), for respondent.



OPINION AND ORDER
Garry, P.J.
Appeal from a judgment of the Supreme Court (Chauvin, J.), entered August 24, 2017 in Saratoga County, upon a decision of the court in favor of plaintiff.
Plaintiff owns and operates an apartment complex in the Town of Clifton Park, Saratoga County, with a policy that prohibits tenants from keeping dogs on the premises. Defendant Michael Bonesteel (hereinafter defendant) began renting an apartment from plaintiff in 2011 under a one-year lease that was renewed for additional one-year terms until November 2014, and thereafter for three-month terms. In November 2013, defendant's therapist sent a letter to plaintiff recommending that defendant should obtain an emotional support animal to assist him with his chronic mental illness, and defendant requested that plaintiff make an exception to its no dog policy as a reasonable accommodation for his disability. Plaintiff denied this request, but offered that it would allow a bird or cat, or allow him an early termination of his lease, should he wish.
Following a complaint from defendant, defendant Attorney General opened an investigation pursuant to Executive Law § 63 to determine whether the denial was discriminatory. After the investigation, the Attorney General sent plaintiff a proposed assurance of discontinuance to settle the matter. Plaintiff rejected the proposed resolution and, in June 2014, commenced this action seeking a judgment declaring that plaintiff's refusal to permit defendant to have an emotional support dog was not in violation of the Fair Housing Act (see 42 USC § 3601 et seq. [hereinafter FHA]) and the Human Rights Law (see Executive Law art 15 [*2][hereinafter HRL])[FN1]. Thereafter, in October 2014, plaintiff notified defendant that it was reducing his lease renewal term to three months. Defendant joined issue and filed counterclaims asserting that plaintiff discriminated against him in violation of the FHA and the HRL by denying his request for an emotional support dog and that the reduction of his lease term was retaliatory. Supreme Court granted a motion by the Attorney General to intervene in the action, and the Attorney General answered and asserted counterclaims on similar grounds to those raised by defendant. Following a nonjury trial, the court issued a judgment that declared that plaintiff's actions did not violate the FHA and the HRL and dismissed the counterclaims. Defendant appeals.[FN2]
As a threshold matter, although not raised by the parties, we address the question whether plaintiff's claims in the declaratory judgment action are justiciable. It is a fundamental principle of our jurisprudence that courts do not give advisory opinions — that is, determinations that purport to resolve issues that depend on events that may never occur and are outside the control of the parties (see Cuomo v Long Is. Light. Co., 71 NY2d 349, 354 [1988]; New York Pub. Interest Research Group v Carey, 42 NY2d 527, 529-531 [1977]; Self-Insurer's Assn. v State Indus. Commn., 224 NY 13, 16-17 [1918]). Further, "[i]f [an] anticipated harm is insignificant, remote or contingent[,] the controversy is not ripe" (Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510, 520 [1986] [internal citation omitted], cert denied 479 US 985 [1986]).
Here, when plaintiff filed the declaratory judgment action, it had already denied defendant's request for an exception to the no dog policy. Defendant had not renewed the request or violated the denial, nor had he commenced any court action. Whether he would eventually do so was then an event that might never occur, and whether the outcome of such an action would be adverse to plaintiff was, and still is, outside the parties' control. Although defendant had filed administrative complaints against plaintiff,[FN3] they were not yet final, no enforcement actions had been taken and no agency "ha[d] taken a definitive position that inflict[ed] an actual, concrete injury" (id. at 522 [internal quotation marks and citation omitted]; see Matter of Adirondack Council, Inc. v Adirondack Park Agency, 92 AD3d 188, 191-192 [2012]). Significantly, plaintiff's complaint makes no allegation that plaintiff was harmed in any concrete fashion by defendant's request for an exception to the no dog policy, or that any such harm was impending; it merely asserted that defendant was not entitled to the exception and asked for an anticipatory determination that its refusal did not violate the FHA or the HRL. In effect, plaintiff's complaint asked Supreme Court to render an advisory opinion, and "[t]he giving of such opinions is not the exercise of the judicial function" (Self-Insurer's Assn. v State Indus. Commn., 224 NY at 16). Thus, the declaratory judgment action is premature and nonjusticiable, and must be dismissed (see Cuomo v Long Is. Light. Co., 71 NY2d at 358; Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 240 [1984]; Matter of Jenkins v Leach Props. LLC, 151 AD3d 1419, 1420 [2017]). Defendant's counterclaims, by contrast, allege concrete injuries — the denial of defendant's request for an emotional support dog and plaintiff's allegedly retaliatory conduct in reducing his lease term — as to which our resolution "[will] have an immediate practical effect on the conduct of the parties" [*3](New York Pub. Interest Research Group v Carey, 42 NY2d at 530). Accordingly, we will examine the merits of the counterclaims.
The FHA defines discrimination against a disabled person [FN4] by an owner of rental housing, as pertinent here, as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a person with a disability] equal opportunity to use and enjoy a dwelling" (42 USC § 3604 [f] [3] [B]). The corresponding provision in the HRL uses nearly identical language (see Executive Law 296 [18] [2])[FN5]. To prove a discrimination claim based upon a failure to accommodate a person's disability, the person must establish that he or she is disabled within the meaning of the statute, that the charged party knew or reasonably should have known about the disability, "that the accommodation was likely necessary to afford the [disabled] person an equal opportunity to use and enjoy the dwelling," that the requested accommodation was reasonable and that the charged party refused to make the accommodation (Olsen v Stark Homes, Inc., 759 F3d 140, 156 [2d Cir 2014]; see Fair Housing Justice Ctr. v Cuomo, 2018 WL 4565152, *12, 2018 US Dist LEXIS 163276, *37 [SD NY, Sept. 10, 2018, No. 18-CV-3196 (VSB)]).
As a preliminary matter, we note that the parties have strictly limited their arguments on appeal on the question of discrimination to two narrow and carefully circumscribed issues: (1) whether defendant has a qualifying disability within the meaning of the FHA and the HRL and (2) whether the accommodation he requested was "necessary to afford [him] equal opportunity to use and enjoy [his] dwelling" as provided in the statutes (42 USC § 3604 [f] [3] [B]; see Executive Law § 296 [18] [2]). Both parties have emphasized that they do not wish this Court to address any other aspect of the statutes' application to the facts presented, such as whether the requested accommodation is "reasonable," and neither party has addressed any such issues in their briefs. Accordingly, we limit our analysis to the two specific issues presented.
Turning first to the question of defendant's disability, a person has a qualifying disability within the meaning of the FHA, as pertinent here, when he or she has "a physical or mental impairment which substantially limits one or more of such person's major life activities" (42 USC § 3602 [h] [1]). Defendant and his therapist, as well as other witnesses, testified at the trial, and the parties stipulated to certain facts. Taken together, this evidence established that defendant was diagnosed with major depressive disorder in 2005, and he is also diagnosed with generalized anxiety disorder. At the time of trial, he had been in ongoing treatment with the therapist, a clinical psychologist, since June 2005, and also treated with a psychiatrist who prescribed and managed his medication. The therapist described the diagnostic criteria for major depression and detailed the specific symptoms that defendant displayed — such as extreme sadness, lack of motivation, difficulty in taking pleasure in anything and sleep disturbances. Defendant left his full-time position as a technical project manager in 2005 due to difficulties with concentration, motivation and communication related to his depression and, since then, has received Social Security disability benefits. His therapist testified that, in brief episodes of improvement, he has occasionally applied for jobs, held temporary employment for limited periods and attempted to do volunteer work, but that he has never been able to sustain these efforts for long.
Until 2011, defendant resided with his wife and daughter in the family home, where a son also resided before leaving for college. The family owned dogs, and defendant was primarily [*4]responsible for their care. In 2011, he moved to plaintiff's apartment complex because of family issues related to his depression. He is now divorced, his former wife has moved to another state and he has little or no contact with his children. He chose plaintiff's complex for its amenities, including a gym, a pool, tennis courts and walking paths, but he did not use them after the first few months of his residence there. At the time of trial, he rarely left his apartment and spent most of his time reading, watching television or using the Internet. He slept during much of the day and was awake for much of the night due to sleep disturbances related to his depression. He did most of his shopping online; he described himself as a "recluse" and his therapist said that his apartment had become a "cell." Defendant described a life of almost complete isolation; he had visitors only twice in the five-year period between moving into the apartment and the trial, and traveled out of town only a few times during those years to attend family events. He testified that he had occasionally spoken with another tenant at the apartment complex, but had not seen the tenant for months at the time of trial. He did not describe any other friends, social experiences or regular contacts other than appointments with the therapist.
The therapist testified that defendant's depression prevented him from functioning on an effective basis socially and vocationally. She opined that he was substantially limited in a major life activity consisting of his ability to successfully connect with positive social support, to enjoy life as other people did, to be around other people and to be active in the community. Plaintiff challenged the extent of these limitations, but did not contest defendant's depression diagnosis and presented no expert testimony to refute the therapist's testimony about his symptoms and limitations.
"When reviewing a nonjury trial verdict, we independently assess the probative weight of the evidence, together with the reasonable inferences that may be drawn therefrom, and grant the judgment warranted by the record while according due deference to the trial court's factual findings, particularly where . . . they rest largely on credibility determinations" (Petti v Town of Lexington, 163 AD3d 1370, 1371 [2018] [internal quotation marks and citations omitted]; see Halpin v Cheikhet, 90 AD3d 1211, 1212 [2011]). Here, Supreme Court credited the therapist's testimony that defendant suffered from chronic anxiety and depression, but declined to determine whether his condition constituted a qualifying disability. Upon our independent review, we find that defendant met his burden to establish that he is disabled within the meaning of the FHA.
Federal courts have found that the ability to interact with others is a major life activity within the meaning of federal disability statutes [FN6] and that a person is disabled for that purpose when such an "impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people" (Jacques v DiMarzio, Inc., 386 F3d 192, 203 [2d Cir 2004]; see Tuman v VL Gem LLC, 2017 WL 781486, *4-5, 2017 US Dist LEXIS 28140, *9-10 [SD NY, Feb. 27, 2017, No. 15 Civ. 7801 (NSR)]). Contrary to plaintiff's argument, defendant is not required to establish a complete failure to communicate or interact with others at all times to establish such a substantial limitation (see Stamm v New York City Tr. Auth., 2011 WL 1315935, *17-18, 2011 US Dist LEXIS 36195, *49-50 [ED NY, Mar. 30, 2011, No. 04-CV-2163 (SLT) (JMA)]). In addition to the testimony regarding defendant's significant limitations in interacting with others and consequent isolation, the undisputed evidence also established that defendant has not held a permanent full-time job since 2005 and that he receives Social Security disability benefits. Working is a major life activity within the meaning of the FHA (see 24 CFR 100.201 [b]), and, "[a]s a general matter, in most cases, individuals who meet the definition of disability for purposes of receiving [supplemental security income] or [Social Security Disability Insurance] benefits also qualify as disabled under the federal disability statutes" (Sinisgallo v Town of Islip Hous. Auth., 865 F Supp 2d 307, 338 [ED NY 2012]; see Brooker v Altoona Hous. Auth., 2013 WL 2896814, *9, 2013 US Dist LEXIS 82228, *28-29 [WD PA, June 12, 2013, No. 3:11—CV—95]). Thus, based upon defendant's significant limitations in the major life activities of working and interacting [*5]with others, we are satisfied that he is disabled within the meaning of the FHA (see Castillo Condominium Assoc. v U.S. Dept. of Hous. and Urban Dev., 821 F3d 92, 98-100 [1st Cir 2016]).
The HRL's definition of disability is broader than those used in the federal disability statutes (see State Div. of Human Rights v Xerox Corp., 65 NY2d 213, 218-219 [1985]). The HRL does not require a showing of a limitation in a major life activity, but instead defines disability, as pertinent here, as "a physical, mental or medical impairment . . . [that] is demonstrable by medically accepted clinical or laboratory diagnostic techniques" (Executive Law § 292 [21] [a]). Defendant's therapist, a clinical psychologist, testified in some detail regarding the clinical techniques used to diagnose depression and defendant's specific symptoms as they related to those criteria, and plaintiff neither challenged the medical acceptability of these techniques nor offered any contradictory evidence. Accordingly, defendant established that he is disabled within the meaning of the HRL (see Ruhlmann v Ulster County Dept. of Social Servs., 234 F Supp 2d 140, 178-179 [ND NY 2002]).
We turn next to the second of the two narrow issues identified by the parties — whether defendant established that an emotional support dog was necessary within the meaning of the FHA and the HRL. As previously noted, the FHA and the HRL use substantially identical language in defining discrimination in this context (see 42 USC § 3604 [f] [3] [B]; Executive Law § 296 [18] [2]). Where, as here, similar language is used in state and federal statutes that are intended to remedy the same types of discrimination, New York courts attempt to resolve state discrimination cases consistently with case law applying the federal statutes (see Matter of Aurecchione v New York State Div. of Human Rights, 98 NY2d 21, 26 [2002]). Federal courts, likewise, evaluate the FHA and the HRL "under the same framework" (Olsen v Stark Homes, Inc., 759 F3d at 153 [internal quotation marks and citation omitted]; see Bhogaita v Altamonte Heights Condominium Assn., 765 F3d 1277, 1285 [11th Cir 2014]). Thus, this Court will rely upon federal precedent in evaluating the issue of necessity under both statutes.
In finding that defendant did not establish that an emotional support dog "may be necessary" within the meaning of the FHA and the HRL (42 USC § 3604 [f] [3] [B]; see Executive Law § 296 [18] [2]), Supreme Court relied upon a Second Department case decided solely under the HRL, finding that residents of a cooperative with a no pets policy were not entitled to own a dog as a reasonable accommodation of their depression and other conditions because they did not show that the dog was "actually necessary in order for them to enjoy the apartment" (Matter of Kennedy St. Quad, Ltd. v Nathanson, 62 AD3d 879, 880 [2009], lv denied 13 NY3d 714 [2009]). In our view, such a standard is inconsistent with the plain language of the FHA and the HRL, which requires only a determination that an accommodation " may be necessary" (42 USC § 3604 [f] [3] [B] [emphasis added]; see Executive Law § 296 [18] [2]; see generally Samiento v World Yacht Inc., 10 NY3d 70, 77-78 [2008]). Moreover, federal courts have not applied such a restrictive standard in interpreting this aspect of the FHA. Instead, federal precedent holds that necessity is established when it is shown that "an accommodation ameliorates the effects of a disability such that the disabled individual can use and enjoy his or her residence as a non-disabled person would" (Anderson v City of Blue Ash, 798 F3d 338, 361 [6th Cir 2015]; see Bhogaita v Altamonte Heights Condominium Assn., 765 F3d at 1288 ["a 'necessary' accommodation is one that alleviates the effects of a disability"]; Olsen v Stark Homes, Inc., 759 F3d at 156 [the accommodation must be "likely necessary to afford the (disabled) person an equal opportunity to use and enjoy the dwelling" (emphasis added)]; Bronk v Ineichen, 54 F3d 425, 429 [7th Cir 1995] ["(T)he concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability"]). It is well established that the FHA must be interpreted in accordance with its "broad remedial intent" (Havens Realty Corp. v Coleman, 455 US 363, 380 [1982]; see Trafficante v Metropolitan Life Ins. Co., 409 US 205, 209 [1972]), and the HRL specifically provides that its provisions "shall be construed liberally for the accomplishment of the purposes thereof" (Executive Law § 300; see Executive Law § 290). Thus, we decline to apply the restrictive standard of necessity enunciated by the Second Department (see generally Oswald v Oswald, 107 AD3d 45, 47 [2013]).
Defendant and his therapist testified that an emotional support dog would alleviate some of his symptoms of depression and anxiety. The therapist testified that an emotional support dog would ameliorate the loneliness and isolation of defendant's life by providing him with companionship and unconditional affection. She further opined that a dog would alleviate the lack of structure in defendant's life and help to move his sleep schedule toward a more normal pattern by requiring him to feed and walk the dog at regular intervals each day. The therapist noted that defendant had followed a more structured schedule when he was still living in his family home, in part because he was then responsible for feeding and walking the family dogs, and that, after he moved out, he returned to the house when necessary to continue caring for and exercising the dogs until his former wife moved away. Owning a dog would require defendant to engage in regular exercise, which the therapist described as "one of the primary behavioral treatments for depression," and would allow him to make better use of the grounds surrounding the apartment complex. She testified that a dog's companionship could alleviate defendant's social anxiety and act as a "security blanket," increasing his confidence and willingness to interact with other people, and would also facilitate social interaction by offering opportunities to meet other people while outdoors with the dog. The therapist opined that increased exercise and social interaction have been shown to have similar effects to antidepressant medication in alleviating depression and anxiety, and that increased energy levels arising from exercise and enhanced social interactions would improve defendant's motivation to engage in various activities of daily life.
Plaintiff offered no expert testimony or other evidence to counter the therapist's opinions on the therapeutic value of an emotional support dog. Instead, plaintiff argued that defendant's depression had begun while he was residing with dogs in the family home, that he knew dogs were not permitted when he moved into the apartment complex and that he lived in the complex for several years before requesting an emotional support dog. However, the therapist testified that defendant's symptoms of isolation and lack of motivation had worsened during the years after he moved to the apartment complex, where he had less social support than while living with his family. She further opined that other therapies had been attempted, but had not been effective to improve his symptoms during this time period. Plaintiff further argues that the therapist declined to testify that it was necessary for defendant to have an emotional support dog, stating instead that a dog would be somewhere between useful and necessary; however, as previously noted, the FHA does not require a showing that an accommodation is "absolutely necessary for the disabled individual's treatment or basic ability to function" (Anderson v City of Blue Ash, 798 F3d at 361-362).
The US Department of Housing and Urban Development — that is, the agency charged with administering the FHA — issued a notice in 2013 providing guidance on the applicability of the FHA to assistance animals, including emotional support animals. That document provides that an emotional support animal is "necessary," as pertinent here, when a disabled person shows that the animal would "provide emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability," and that a disabled person provides adequate support for such a request when he or she shows "that the animal in question will provide some type of disability-related assistance or emotional support" (US Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity, Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs, FHEO-2013-01 at 3-4, 6 [Apr. 25, 2013], available at https://www.hud.gov/
sites/documents/servanimals_ntcfheo2013-01.pdf). This Court defers to the interpretation of the agency charged with administering a statute where, as here, the interpretation of a statutory term requires knowledge of underlying operational practices or the evaluation of factual data and rational inferences, rather than pure legal interpretation of statutory terminology (see e.g. Matter of Gonzalez v Annucci, 32 NY3d 461, 471 [2018]). Federal courts follow a similar practice (see Chevron, U.S.A., Inc. v Natural Resources Defense Council, Inc., 467 US 837, 844 [1984]). Here, applying the appropriate deference to the notice, we find that defendant "offered sufficient evidence that having [an emotional support] dog would affirmatively enhance his quality of life by ameliorating the effects of his disability," and thus demonstrated necessity within the meaning of the FHA and the HRL (Bhogaita v Altamonte Heights Condominium Assn., 765 F3d at 1288; [*6]see Nelson v Long Reef Condominium Homeowners Assn., 2016 WL 4154708, *23-24, 2016 US Dist LEXIS 103022, *63-65 [D VI, Aug. 5, 2016, No. 2011-0051]; Smith v Powdrill, 2013 WL 5786586, *6, 2013 US Dist LEXIS 154485, *16-18 [CD CA, Oct. 28, 2013, No. CV 12-06388 DDP (RZx)]; see also Anderson v City of Blue Ash, 798 F3d at 360-362).
Thus, upon our independent assessment of the evidence and the reasonable inferences to be drawn therefrom pertaining to the two narrow issues presented upon this appeal, we find that defendant established that he is disabled and that an emotional support dog is "necessary to afford [him] equal opportunity to use and enjoy [his] dwelling" within the meaning of the FHA and the HRL (42 USC § 3604 [f] [3] [B]; see Executive Law 296 [18] [2]). Given the limited scope of review upon this appeal, we do not opine on the remaining factors pertinent to whether plaintiff discriminated against defendant by failing to make a reasonable accommodation of his disability, and we remit the matter to Supreme Court for a final determination on defendant's counterclaims raising this issue.
As for the counterclaims alleging retaliation, the FHA makes it unlawful to "coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of [the person] having exercised or enjoyed" any protected right (42 USC § 3617; see 24 CFR § 100.400 [c] [5], [6]). The HRL likewise prohibits "retaliat[ion] or discriminat[ion] against any person because he or she has opposed any practices forbidden under [the HRL] or because he or she has filed a complaint, testified or assisted in any proceeding under [the HRL]" (Executive Law § 296 [7]). To establish retaliation under either statute, a complainant must show that he or she engaged in protected activity, that the respondent was aware of this activity, that the respondent took adverse action against the complainant and that a causal connection exists between the protected activity and the adverse action (see Broome v Biondi, 17 F Supp 2d 211, 218-219 [SD NY 1997]). The complainant's burden to make this prima facie showing "is minimal and de minimis" (Joseph's House & Shelter, Inc. v City of Troy, 641 F Supp 2d 154, 158 [ND NY 2009] [internal quotation marks and citation omitted]). Once that showing has been made, a burden-shifting analysis is employed by which the respondent must articulate a legitimate nondiscriminatory reason for the adverse action, shifting the ultimate burden back to the complainant to demonstrate that this reason was a pretext (see Walker v City of Lakewood, 272 F3d 1114, 1128 [9th Cir 2001], cert denied 535 US 1017 [2002]).
Here, plaintiff reduced defendant's lease term from one year to three months shortly after defendant complained to the Attorney General and plaintiff filed its declaratory judgment action. The parties do not dispute that defendant was engaged in protected activity and that plaintiff was aware of defendant's activity. Moreover, plaintiff admits the existence of a causal connection; plaintiff's owner candidly testified that defendant's lease term was reduced because of the ongoing litigation and to make it easier for defendant to move out if plaintiff won. Supreme Court found, however, that defendant failed to establish that the reduction constituted an adverse action, as he did not show that he suffered any harm other than some increase in his anxiety.
To establish retaliation, an "adverse action must have some materially adverse effect on the [complainant]" (Joseph's House & Shelter, Inc. v City of Troy, 641 F Supp 2d at 159 [internal quotation marks and citations omitted]) and must be "of sufficient magnitude to permit a finding of intimidation, coercion, threats or interference" (Lynn v Vill. of Pomona, 373 F Supp 2d 418, 433 [SD NY 2005] [internal quotation marks and citation omitted], affd 212 Fed Appx 38 [2007]). As pertinent here, "interference . . . has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the [FHA]" (Walker v City of Lakewood, 272 F3d at 1129 [internal quotation marks and citations omitted]). No showing of force or violence is required, and even a voluntary action may constitute interference if it is undertaken for a retaliatory motive (see Marks v BLDG Mgmt. Co, 2002 WL 764473, *12, 2002 US Dist LEXIS 7506, *41 [SD NY, Apr. 26, 2002, No. 99 Civ. 5733 (THK)], affd 56 Fed Appx 62 [2003], amended 57 Fed Appx 501 [2003]). Threats of eviction may constitute adverse actions for this purpose, even when the eviction is never carried out (see Neudecker v Boisclair Corp., 351 F3d 361, 363-364 [8th Cir 2003]).
We are satisfied that plaintiff's actions were sufficiently adverse to constitute interference with the exercise of defendant's rights. Notably, discrimination against a disabled person in the terms or conditions of a lease is prohibited by the FHA and its implementing regulations (see 42 USC 3604 [b], [f] [2]; 24 CFR 100.65 [b] [1]; 100.202 [b]). Plaintiff stipulated that it offered one-year lease terms to most of its tenants "but ha[d] a practice of shortening lease terms for tenants with a history of late payments or disruptive conduct." By unilaterally reducing the one-year lease term that plaintiff had previously made available to defendant because of his disability-related complaint, plaintiff classified him as one of its troublesome tenants, and did so for the stated purpose of making it easier for him to move out. The effect was to reduce defendant's housing security and to treat him differently from other, more desirable tenants by requiring him to go through the renewal process four times more often each year. Defendant testified that the reduction in his housing security caused him concern and anxiety, and we may infer that the frequent obligation to go through the renewal process was particularly onerous in view of the previously-discussed limitations related to his disability. We are persuaded that the reduction of defendant's lease term "might well discourage tenants from exercising their rights under the FHA, the very evil [that 42 USC § ] 3617 is designed to prevent" (Marks v BLDG Mgmt. Co, 2002 WL 764473 at *12, 2002 US Dist LEXIS 7506 at *41). Thus, defendant satisfied his prima facie burden to establish that the reduction of his lease term was an adverse action. As plaintiff made no attempt to identify a legitimate, nonpretextual reason for the reduction, the burden did not shift to defendant to demonstrate that the reason was pretextual. Accordingly, defendant is entitled to judgment in his favor on the retaliation counterclaims. We remit the matter to Supreme Court for the determination of an appropriate remedy.
Egan Jr., Lynch, Clark and Aarons, JJ., concur.
ORDERED that the judgment is modified, on the law, with costs to defendant Michael Bonesteel, by reversing so much thereof as (1) granted plaintiff's first cause of action seeking a declaratory judgment in its favor and (2) dismissed defendant Michael Bonesteel's counterclaims for discrimination and retaliation; said cause of action dismissed, said defendant's retaliation counterclaims granted and matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.



Footnotes

Footnote 1: The complaint also included other causes of action, which Supreme Court found to be moot. As plaintiff made no related arguments on appeal, we deem any such issues to be abandoned (see Matter of Schulz v New York State Legislature, 5 AD3d 885, 888 n 2 [2004], appeal dismissed 2 NY3d 793 [2004], lv denied 3 NY3d 606 [2004]).

Footnote 2: The Attorney General notified this Court that it did not intend to file a brief and asked the Court not to draw any negative inferences about the Attorney General's position based upon that decision.

Footnote 3: In addition to defendant's complaint to the Attorney General, he had also filed a complaint with the US Department of Housing and Urban Development that was pending when plaintiff commenced this action. He later withdrew that complaint, and a complaint that he subsequently filed with the Division of Human Rights was dismissed for lack of jurisdiction.

Footnote 4: The FHA uses the term "[h]andicap" (42 USC § 3602 [h]). However, federal courts ordinarily substitute the term "disability" when discussing the FHA, a practice that this Court will also follow (see Austin v Town of Farmington, 826 F3d 622, 625 n 2 [2d Cir 2016], cert denied ___ US ___, 137 S Ct 398 [2016]).

Footnote 5: "It shall be an unlawful discriminatory practice for [an] owner [of rental housing] . . . [t]o refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a] person with a disability equal opportunity to use and enjoy a dwelling" (Executive Law § 296 [18] [2]).

Footnote 6: The FHA and the Americans with Disabilities Act use almost identical language in defining disability (see 42 USC §§ 3602 [h] [1]; 12102 [1] [a]; Bragdon v Abbott, 524 US 624, 631-632 [1998]).